**OPPORTUNITY HOMES, INC.,**
Petitioner/Cross–
Respondent,

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent/Cross–**
Petitioner.

Nos. 95–5605, 95–5699.

United States Court of Appeals,
Sixth Circuit.

Submitted May 24, 1996.

Decided Dec. 9, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 5, 1997.*

---

* Judge Krupansky would grant rehearing for the reasons stated in his dissent.

David H. Shaffer, Roger W. Strassburg, Jr. (briefed), Joondeph & Shaffer, Akron, OH, for Petitioner Cross–Respondent.

Fred L. Cornnell, Jr. (briefed), National Labor Relations Board, Office of the General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard (briefed), National Labor Relations Board Appellate Court Branch, Washington, DC, for Respondent Cross–Petitioner.

Before: KRUPANSKY, DAUGHTREY, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KRUPANSKY, J. (pp. 1521–43), delivered a separate dissenting opinion.

MOORE, Circuit Judge.

Opportunity Homes, Inc. ("OH") petitions for review of an order of the National Labor Relations Board (the "NLRB" or "Board") directing OH to cease and desist from certain unfair labor practices and to take affirmative steps to remedy their effects. The Board in turn seeks enforcement of its order. Because substantial evidence supports the Board's factual findings, we deny the petition for review and grant the cross-application for enforcement.

## I. Background

Although some of the facts of this case are in dispute, OH's petition does not challenge the following findings. OH provides full-time residential care for twenty-two mentally and physically disabled individuals in Lisbon, Ohio. At the OH facility on Friday, January 24, 1992, an official of the Service Employees International Union and forty OH employees and family members approached Mary Jane Jones, the head administrator. The union official gave Jones a petition signed by forty-one of the forty-four OH employees who were eligible to be part of the union's bargaining unit. The petition announced that the employees had organized a local unit of the union, and the union official demanded that OH recognize it. Jones orally responded that she would recognize the union as the bargaining representative of the employees.

The following Monday, Jones posted a memorandum to all employees at the OH facility. The memorandum professed support for the union but disappointment in the employees for avoiding her after the Friday encounter and for not coming to her with their complaints: "I saw the Great Wall of China rebuilt at Opportunity Homes late Friday afternoon." It also cautioned the employees to choose their union representative carefully, characterizing the Friday encounter as an attempt to intimidate her with numbers that "did tremendous harm to our program." The memorandum then continued:

> Because of the dependable crew that we had working for us we were able to eliminate the position of personnel director and put the money towards things such as wages and bonuses. Because we will now be forced to follow the policy manual to the letter, and will also need an administrative union representative, an ad will soon be placed for a full time personnel director. Per your request, anything I have to say to the employees will come via an official memo or other similar form. Legal counsel has advised me to close my open door policy. I will address employee problems, but only through a third person, the union representative. Since the union must approve all benefit plans, the ones planned

for this year will all be tabled, including the health insurance plan you were shown a couple of weeks ago. I was able to negotiate a plan that would eliminate all pre-existing conditions, but the time limit is running out.

> ... I am not scared of your union or threatened by it in any way. If I was, I definitely would not have so graciously recognized your position. I will do what I have to do for these residents. The words strike and walkout do not intimidate me. I, unlike some of you, have made a commitment to the handicapped citizens who employee [sic] me.

Despite this recognition of the union, Jones and OH's board of directors refused repeated requests to bargain with it, until OH finally acknowledged recognition in October 1992.

After the memorandum was posted, the relationship between the employees and management suffered a breakdown; each side blamed the other for it. Within four days of the posting of the memorandum, director of nursing Judy Manning responded to nurse Lorena Howell's reluctance to sign a disciplinary report by shouting that Howell would have signed it without objection prior to the union's arrival, and program director Richard Fithian told activity aide Linda Joy that he was issuing her a written warning for misplacing some documents—rather than simply retrieving the documents himself—because unionization required him to follow strict procedure. In the following months, OH discontinued policies of distributing paychecks early and of providing pay advances, changed and reduced certain employees' work hours, adopted a more strict policy regarding signing informational memoranda, and prohibited employees from wearing pins at a time when employees had begun to wear pro-union paraphernalia. Active union supporter John Tharp saw his job eliminated a few weeks after he challenged a disciplinary report from Fithian; Tharp was forced to work reduced and inconvenient hours at another position, and Fithian did not inform him or any other unit employee when soon thereafter Fithian created and filled a new position that incorporated many of Tharp's former duties. Supervisor Kathryn Fristik

repeatedly told employees that they would be fired if they took complaints to anyone but OH management.

After examining hundreds of exhibits and hearing the testimony of over twenty witnesses, an administrative law judge (an "ALJ") found that this and other conduct discussed below constituted unfair labor practices under 29 U.S.C. § 158. He accordingly recommended ordering OH to cease and desist from such practices and to take various affirmative remedial steps. The NLRB adopted the ALJ's findings and recommendations and issued the order, with minor changes. The case is now before us on OH's petition for review and the Board's cross-application for enforcement.

## II. Applicable Law

An employer commits an unfair labor practice if it makes an employment decision in order to discourage union membership or to interfere with employees' right to organize. 29 U.S.C. § 158(a)(1), (3). The general counsel of the NLRB has the burden of proving by a preponderance of the evidence that protected union activity was a substantial or motivating factor in the adverse employment decision. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983); *NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir.1995). If he or she carries this burden, the employer may avoid liability by proving by a preponderance of the evidence that it would have taken the adverse action even in the absence of the illicit motivation. *Transportation Management*, 462 U.S. at 401, 103 S.Ct. at 2474; *Cook Family Foods*, 47 F.3d at 816.

The Board's legal conclusions are reviewed de novo, but its findings of fact and application of law to fact are subject to the "substantial evidence" standard of review. *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Furthermore, "[d]eference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting testimony and essential credibility determinations have been made.'" *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir.) (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir.1985)), *cert. denied*, 484 U.S. 896, 108 S.Ct. 230, 98 L.Ed.2d 188 (1987).

## III. Suspension and Termination of Nursing Staff

The most complicated factual dispute here involves the suspension and subsequent termination of Kathy Byers, Lorena Howell, Gayle Milhoan, and Carol Redmond, all licensed practical nurses who worked at OH. The ALJ found and the Board agreed that the suspensions and terminations were the result of the nurses' active support for the union. OH does not dispute the findings that the nurses were known union activists and that they had exemplary records prior to the unionization effort, but it does challenge other evidentiary findings on which the NLRB's conclusion was based and offers an alternative explanation for the adverse employment actions.

The ALJ found that the unionization attempt prompted management officials, especially Judy Manning, the four nurses' supervisor and the director of nursing, to adopt a hands-off, stonewalling policy towards the nursing staff. Communication ceased and the quality of nursing care accordingly declined. As a result, an annual Ohio Department of Health ("ODH") inspection in April 1992 cited OH for a greater number of regulatory violations than ever before, putting the facility's state certification and funding in jeopardy. OH management seized this opportunity to get rid of the pro-union nursing staff. It blamed the nurses for almost half the violations, suspended the nurses, and fired them after a biased internal investigation.

According to OH, however, it was the nurses, not the management, who used the ODH survey for their own ends. OH asserts that the nurses purposely arranged the violations and directed ODH inspectors to the evidence thereof. Their intent was to force

the facility to shut down, because their union liaison allegedly had told them that the state would then appoint a receiver and the current management would be replaced. To provide support for this theory, OH attacks three specific ALJ findings: (1) general anti-union animus on the part of OH management, (2) Manning's hands-off policy, and (3) the nurses' lack of responsibility for the violations.

Substantial evidence supports the ALJ's finding that OH management generally had an anti-union attitude. The events discussed in part I indicate that management was hostile to the union; for instance, the memorandum Jones issued promised in no uncertain terms to enforce work rules more strictly and implied ominously that health care and wages would suffer as a result of unionization. Furthermore, between the posting of the memorandum in January and the arrival of the ODH inspectors in April, policies regarding overtime pay, paycheck distribution, replacement workers for sick days, doctors' excuses for missing work, and scheduling vacation were all changed, to the nurses' detriment. Management also removed a pay telephone used by employees, restricted access to a copying machine that the nurses routinely used, and changed the locks on the nurses station without giving the staff new keys. OH argues that ongoing renovations and financial difficulties made these changes necessary, but there was considerable evidence to the contrary, and we therefore defer to the ALJ's reasonable resolution of conflicting accounts. Finally, OH does not dispute the finding that it recognized the union in January but refused to bargain with it until October.

Likewise, we must uphold the ALJ's conclusion that Manning had an uncommunicative, "hands-off" attitude towards the nursing staff. OH's argument on this point simply reads convenient conclusions into the testimony of OH management and ignores the nurses' versions of the same events. For instance, one of the keys to the ALJ's conclusion was that no coordinated preparation was done for the April 1992 ODH survey. OH discounts this finding by asserting that no preparation was *ever* done for *any* ODH

survey because OH never knew when an ODH survey might occur. The nurses, however, testified that preparation for ODH surveys had been routine in past years and that the lack of such preparation for the 1992 inspection was therefore a marked departure from established practice. Even management officials admitted, contrary to the assertion in OH's brief, that the date of the ODH survey could be predicted with some accuracy. Moreover, Manning herself testified that she took a more passive approach to her duties in response to advice from legal counsel, and that once she decided that the ODH violations were the nurses' fault, she never asked them for their side of the story.

Finally, the parties' disagreement regarding who was responsible for the ODH violations presents another conflict of evidence that requires us to defer to the ALJ. Jones's analysis of the ODH survey results found that nursing deficiencies were responsible for forty-five percent of them, although her breakdown includes director of nursing Manning within the culpable group. Nurse Byers's analysis indicates that the nursing department was only wholly responsible for five of the approximately sixty citations and partly responsible for seven others.

Neither of these analyses is more inherently credible than the other. Byers's was admittedly prepared for litigation, but the process by which Jones arrived at her decision to blame the nurses was not particularly objective either. The evidence clearly showed that even before beginning any internal investigation, management had decided that the nurses had caused the regulatory violations by intentionally sabotaging the facility. The investigation that did eventually take place was highly suspect; Jones hired a former OH management official, Marilyn Robb, to investigate the nursing deficiencies at OH. The nurses were suspended after Robb had investigated only four of the twenty-two residents' records, and Robb's final report, which was allegedly the basis for the decision to fire the nurses, contained conclusory statements regarding the nurses' illicit motivations and stated on its cover page, "This report ... serves as the back up documentation needed to support [the nurses']

suspension from this facility and subsequent termination." The ALJ reasonably viewed this evidence as unreliable.[1]

The evidence of the nurses' intent to sabotage the facility is also weak. OH points to disputes between the nurses and the management regarding the administering of fluids and medicine to residents and concludes that the nurses' accounts of these disagreements can only be explained by a deep-seated malice towards the facility and its residents. The evidence, however, can reasonably be read as showing a genuine concern on the nurses' part that medical treatment not be undertaken without proper doctors' orders. Furthermore, OH's theory relies on the supposition that the union was encouraging ODH violations in order to force the facility to close, in the belief that the State of Ohio would then appoint a receiver to replace the OH management, but there is no evidence that anyone discussed the possibility of receivership before the ODH survey. Nurse Byers and a union official testified that they began to discuss that possibility only *after* the survey, when *management* raised the specter of a closing.

In short, OH's challenge to the ALJ's conclusion regarding the suspension and firing of the nurses is based on its own one-sided interpretation of the evidence. While this interpretation is not necessarily frivolous, the evidence is also clearly adequate to support the ALJ's alternative interpretation. Because the ALJ had the opportunity to evaluate the witnesses' testimony in person, we defer to his decision.

### IV. Termination of Blaine Ritchie

██ A second disputed issue is the firing of aide Blaine Ritchie, another well-known union supporter and one who appeared on local television—ten days before his termination—accusing Jones of having reneged on her recognition of the union. OH claims that program director Richard Fithian fired Ritchie for leaving a physically disabled resident named Donald alone in the shower. Donald fell and had to be taken to the hospital for treatment of a head abrasion. The ALJ found and the Board agreed that Ritchie was fired for his pro-union activity.

The entire controversy surrounding what happened to Donald centers on what Ritchie said to nurse Aaron Rowe when the latter arrived at the scene of the fall. According to Ritchie, he had undressed Donald, was holding his hand to steady him, and was turning toward the shower controls when he felt Donald fall. Ritchie called for help, and Rowe arrived and asked how the fall had occurred. Ritchie said, "I don't know, I don't know whether he had a seizure or slipped on the wet floor." Rowe, however, testified that Ritchie also said, "I found him like this." Rowe therefore reported that Ritchie had left Donald unattended. Fithian allegedly believed Rowe's account of what Ritchie said and fired Ritchie for intentional neglect of a resident.

Substantial evidence supported the ALJ's decision to view as suspect Fithian's stated reasons for believing Rowe. Fithian claimed that Ritchie's story had changed after the night of the incident, but Ritchie consistently maintained that he had been with Donald at the time of the fall and simply did not know exactly what had happened. Fithian also stated that he believed Rowe because Rowe was "in a more professional position" than Ritchie, but the ALJ explicitly found Rowe's testimony evasive and his memory unreliable. Fithian testified that his past dealings with Ritchie and the latter's disciplinary history were a factor in the decision to credit Rowe's story, but the ALJ reasonably concluded that Ritchie's two previous disciplinary incidents, which had to do with leaving a hair dryer where a resident had access to it and jumping the curb while driving an OH vehicle, had

---

1. OH claims that the NLRB should have reopened the record to include the results of a 1993 ODH survey, which produced fewer citations than the 1992 survey. The Board need not reopen a record to admit new evidence unless the new evidence would require a different result. *NLRB v. Cutter Dodge, Inc.*, 825 F.2d 1375, 1381 (9th Cir.1987); *NLRB v. Johnson's Indus.* *Caterers, Inc.*, 478 F.2d 1208, 1209 (6th Cir. 1973). That standard is not met here. OH argues that the improved survey results in 1993 indicate that the fired nurses were responsible for the 1992 citations, but the change could just as easily have been due to OH management's abandonment of its uncommunicative policy or to any number of other factors.

nothing to do with credibility, and he found Ritchie to be "a highly credible witness." Finally, Fithian interpreted a telephone call that Ritchie made to Rowe after the termination decision as an attempt by Ritchie to get Rowe to "change his story," even though by both individuals' accounts it was a friendly chat about their views of what had happened. Given Fithian's previous arguably anti-union conduct, as evidenced by his treatment of Tharp and Joy, the ALJ reasonably concluded that the articulated reasons for firing Ritchie were a pretext.

## V. Termination of Donna Yeager

██ In June 1992, supervisor Kathyrn Fristik fired aide Donna Yeager for insubordination. The ALJ found that the termination would not have occurred absent Yeager's known pro-union stance, and the Board explicitly affirmed this finding. OH now argues that the ALJ and Board ignored compelling evidence.

The events leading up to Yeager's termination began on May 29, 1992, when Fithian gave Yeager a five-day suspension for behaving inappropriately in front of an ODH team that had returned to follow up on its April survey. According to Yeager, at the time Fithian told her of the suspension she said, "Union?" and he replied, "Yes." The ALJ credited Yeager's testimony on this point and reasonably concluded that the suspension was prompted by anti-union animus. Three days after returning from her suspension, Yeager was fired for being insubordinate to Fristik in front of a county inspector; the inspector testified at the hearing and corroborated Fristik's account of the incident.

Given the inspector's presumably impartial testimony and the fact that Yeager's personnel file had a number of reports of prior incidents in which she was cited for being disrespectful—several of which predate the unionization effort—her insubordination on the day she was fired is well established. Nevertheless, the ALJ's conclusion survives appellate review because of the lack of evidence that Yeager would have been terminated if not for the May 29 suspension. On the stand, Fristik could not say that she would have fired Yeager if the suspension had not occurred, and the evidence that the suspension was motivated by an anti-union animus is considerable. Both the ALJ and the Board explicitly relied on this testimony in finding that Yeager's termination constituted an unfair labor practice. Substantial evidence supports their conclusion.

## VI. Reduction of Brad Martin's Pay

██ Each of the adverse employment actions discussed above was found to be a violation of subsection (a)(3) of 29 U.S.C. § 158. The ALJ characterized the reduction of Brad Martin's pay in July 1992, however, as a violation of subsection (a)(5), which makes it an unfair labor practice to refuse to bargain collectively. The ALJ therefore did not conclude that anti-union animus played a role in the decision to reduce Martin's pay; he instead viewed the reduction as a unilateral change in a condition of employment over which OH, having recognized the union, had an obligation to bargain. OH did not address this issue before the NLRB and has not briefed it here. "If a company fails to address or take issue with the Board's findings and conclusions with regard to violations of the [National Labor Relations] Act, then the company has effectively abandoned the right to object to those determinations." *Hyatt Corp. v. NLRB*, 939 F.2d 361, 368 (6th Cir.1991); *see also* 29 U.S.C. § 160(e) (precluding review of argument not raised before NLRB except in extraordinary circumstances). We therefore decline to review that portion of the Board's order having to do with the reduction in Martin's pay.

For the foregoing reasons, we **DENY** OH's petition for review and **GRANT** the NLRB's cross-application for enforcement of the order.

KRUPANSKY, Circuit Judge, dissenting.

I enter my dissent to Administrative Law Judge (ALJ) Richard H. Beddow, Jr.'s disingenuous review of the evidence developed during the course of the trial of this cause and his result-oriented opinion as affirmed by the National Labor Relations Board (NLRB).

To prove unlawful discharge in retaliation for activities protected by the federal labor statutes, the *NLRB HAS THE INITIAL BURDEN OF PROVING BY A PREPONDERANCE OF THE EVIDENCE* that an employee's protected conduct constituted a "substantial or motivating factor in the discharge" of an employee. Thereafter, the burden shifts to the employer to prove by a preponderance, as an affirmative defense, that "the discharge rested on the employee's unprotected conduct as well and that the employee would have lost his [or her] job in any event." *N.L.R.B. v. Transportation Management,* 462 U.S. 393, 398–403, 103 S.Ct. 2469, 2472–75, 76 L.Ed.2d 667 (1983). Appellate review of any finding by the Board demands an independent comprehensive examination of relevant sections of the record to determine if its findings were supported by substantial evidence developed during the trial. 29 U.S.C. § 160(e) & (f); *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 493–94, 71 S.Ct. 456, 467–68, 95 L.Ed. 456 (1951). "Substantial evidence" signifies that quantum of evidence which a reasonable mind might accept as adequate to support a proposition. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938).

A reviewing court may *not,* however, restrict its review *solely* to the evidence which supports the Board's findings, conclusions, and order. To the contrary, the appellate court, like the ALJ and the NLRB, is duty bound to accord due *impartial* consideration to *all* record evidence material to the proposition at issue. On review, if reasonable minds cannot accept a finding as true in light of *all* relevant evidence, *including* the evidence which fairly detracts from the weight of the evidence supporting that finding, it must be set aside. *See, e.g., Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464–65; *Paducah Marine Ways v. Thompson,* 82 F.3d 130, 133 (6th Cir.1996); *N.L.R.B. v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir.1993). In the instant case, as demonstrated by the record, ALJ Beddow, Jr. compromised his responsibility to impartially consider the totality of the evidence devel-

oped during the course of the hearings before him and to assign appropriate credibility and legal determinations in accordance with accepted dictates of judicial practice and procedure.

The disparities between the evidence disclosed by the record and the factually convoluted editorial commentary resorted to by the ALJ to justify factually unsupported findings and conclusions tax the credibility "which a reasonable mind might accept as adequate to support a proposition." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938).

In arriving at this critical observation, I am well aware of Federal Rule of Civil Procedure 52(a), which reads in part:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

I am further cognizant of the Supreme Court's admonition in *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985):

> When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations,* for factors other than demeanor and inflection go into the decision whether or not to believe a witness. *DOCUMENTS OR OBJECTIVE EVIDENCE MAY CONTRADICT A WITNESS' STORY; OR THE STORY ITSELF MAY BE SO INTERNALLY INCONSISTENT OR IMPLAUSIBLE ON ITS FACE THAT A*

*REASONABLE FACTFINDER WOULD NOT CREDIT IT. WHERE SUCH FACTORS ARE PRESENT, THE COURT OF APPEALS MAY WELL FIND CLEAR ERROR EVEN IN A FINDING PURPORTEDLY BASED ON A CREDIBILITY DETERMINATION.* Anderson, 470 U.S. at 575–76, 105 S.Ct. at 1512. (Emphasis added).

Sensitive to the evidence that, in its totality, substantially supported the respondents and militated against the Labor Department's enforcement proceedings, and in an attempt to justify his administrative disposition, the ALJ abandoned resort to the record and contrived an implausible hypotheses that respondent Opportunity Homes, Inc. (OH), a reputable business enterprise engaged in the operation of a residential care facility that employs approximately fifty or more managerial and non-managerial employees, together with an available medical staff of physicians servicing twenty-two severely physically and mentally impaired resident/patients, *INITIATED A MANAGEMENT CONSPIRACY TO INTENTIONALLY DESTROY ITSELF* by soliciting decertification of its state license, receivership, shutdown, relocation of resident/patients to another home, and ultimate bankruptcy, merely so that it could justify the discharge of four licensed practical nurses (LPNs), a habilitation aid, and a direct staff aid, and circumvent unionization.

The ALJ rationalized:

Here, Respondent's defense is based upon an elaborate attempt to show that it validly relied upon the findings of the Ohio Department of Health's (ODH) annual review and its own investigation to conclude that the LPN [sic] had engaged in willful misconduct that jeopardized both the well being of the residents and the Respondent's State Certification and that this misconduct justified their terminations.

I am aware that some (courts), [sic] have expressed a skepticism regarding the extent to which an employer is willing to suffer loss of business or other operational or economic losses in order to delay or avoid the feared effects of employee union-

ization. While it may make little sense in an objective, after-the-the fact viewing, employers can be obstinate to the extreme when faced with the challenge of unionization and they can be willing to suffer perceived temporary losses or inconveniences in order to delay or avoid the perceived long term effects that formal certification of a union might bring.

As unlikely as it might appear at first glance, I find the record here supports the General Counsel's contentions and shows that the Respondent engaged in "indifferent" behavior that intentionally or inadvertently "set up" circumstances that created an apparent opportunity for it to seize upon the report of a state agency to justify significant retaliatory actions against its LPNs that it otherwise had refrained from taking (upon the admitted advice of its initial counsel), after its initial discriminatory reaction in issuing a series of employee warnings.

ALJ Decision of December 29, 1993, page 16; *J.App.* at 34.

To support the syllogism that the personnel discharges here in controversy constituted unfair labor practices, the ALJ invoked an incantation of the respondent's "anti-union animus" as the illegal underlying motive for the terminations at issue. In assigning weight to the accuracy of his characterization, reasonable minds recognize that generally *antagonism* is the fruit of emotional controversy. In the instant case, the ALJ converted the presence of what he characterized as "anti-union animus" into an all-purpose magical talisman that transmuted, without exception, *ALL EMPLOYER ACTIONS ADVERSE TO ANY EMPLOYEE INTO UNFAIR LABOR PRACTICES IRRESPECTIVE OF THE RECORD EVIDENCE.*

The panel majority has accepted the ALJ's conclusions of "anti-union animus," citing to the after-the fact reactions of Mary Jane Jones, the administrator of day-to-day facility operations, to the union's hostile confrontation of January 24, 1992, relying upon her notice to employees of January 26, 1992 [misdated 1991] (*J.App.* at 458–59); her directed hands-off policy to Judy Manning, the super-

visor of the LPNs; and respondent's refusal to negotiate with the union.

The Jones notice, which speaks for itself, apart from its expressions of emotional distress, disbelief, and frustration, resulting from what she perceived as employee rejection of their existing long standing cooperative friendly relationship, obviously derives from the considered advice of respondent's legal counsel. It announced the discontinuance of her employee open-door policy and direct employee discussions; consideration/resolution of employee concerns only upon written request and/or through an intermediary union representative; strict implementation of all rules and regulations of the defendant's policy manuals; suspension of negotiations addressing employee benefit plans which could not be finalized without union approval, pending the outcome of the unionization effort; and the employment of a personnel director to act as liason between employees and management. Although written in lay language, its content conveyed legal counsel's prudent directions to supervisory personnel to implement all of the respondent's rules and regulations of the policy manual in an arms-length manner to avoid adversary confrontations and protect management from charges of unfair labor practices threatened by the union on January 24, 1992.

The record of testimony bearing upon the identity of the source of any animus that existed between the parties, the degree of its malevolence, and the scope of its infection, is reflected by the tone of the union's initially orchestrated confrontation between the parties on January 24, 1992, and its aftermath, which disclosed the union's covert intention to displace corporate officers and directors through a state-imposed receivership, without imperiling employee job security, by generating and filing numerous complaints of substandard resident/patient treatment and services with state agencies, including the Ohio Department of Health and the Ohio Department of Mental Retardation. The union's dedicated commitment to implement and successfully achieve the objectives of its highly sophisticated organizational effort, complete with regular news releases and so-licited media coverage, is memorialized in the record by evidence of a series of previously seldom experienced infractions that coincidentally began to surface immediately after the union challenge of January 24, 1992 and culminated with the threatened decertification of the respondent's care facility by the Ohio Department of Health and the respondent's initiation of corrective measures calculated to counteract the union's covert campaign of decertification which included, among other actions, the suspension and subsequent discharge of four LPNs, a habilitation aid, and a direct staff aid.

The correlation assigned by the ALJ between respondent's anti union animus and its refusal to negotiate with the union between January 24, 1992 and October 12, 1992, the date on which OH voluntarily recognized the union without an election, is equally tenuous in light of the respondent's adamant assertions that Jones was acting without either direct or apparent authority to recognize the union as the employees' bargaining representative in the absence of an appropriate election which the union refused to pursue.

29 U.S.C. § 159(c)(1) provides that whenever a petition has been filed "(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative ... the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice.... If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."

The union's decision *not* to exercise its option to invoke 29 U.S.C. § 159(c) and force an *immediate election* that *assured a union/employee victory,* and the *immediate commencement of contract negotiations* by eliminating the agency issue of Jones' direct and/or apparent authority to commit her principals to a policy decision of union recognition which attached to a purported but

denied January 24, 1992 comment attributed to Jones, is inexplicable and militates against the union's credibility.[1] *N.L.R.B. v. Engineers Constructors, Inc.*, 756 F.2d 464 (6th Cir.1985).

Because the respondent recognized the union as the employee bargaining agent on October 12, 1992 without an election, the issue concerning the direct or apparent agency of Jones to ostensibly commit the corporate officers and directors to a policy decision of recognizing the union on January 24, 1992 without an election is not before this court for review. It is significant only for the purpose of again reflecting the pro union mindset of the ALJ's circuitous reasoning in resolving the agency issue and other issues of this case. Mindful of the NLRB's initial burden of proving the direct or apparent authority of Jones to commit her principal to a policy decision, and noting a total absence of any effort by the NLRB to introduce or proffer even a scintilla of evidence addressing the scope of her authority, is demonstrated by a search of the record. The ALJ obfuscated his factually unsupported conclusions by *shifting the burden to the respondent OH* to prove that Jones was without direct or apparent authority to recognize the union on January 24, 1992, or at any time thereafter:

Respondent also argues that Administrator Jones did not have the authority to act on behalf of the board of directors in the matter of union recognition, an argument that seems strangely out of place in view of respondent's stipulated submission of Joint Exhibit No. 1, Respondent's letter to Union representative Timko on Respondent's letterhead, which offers Respondent's recognition of the Union and the described unit of employees, a letter that is signed solely by Jones, as administrator, and a letter that makes no mention of otherwise being authorized or done at the direction of the board.

The self-serving notes of the board indicates that they discussed that Jones did not have authority to recognize the Union's demand, however, at no subsequent time prior to its recognition of the Union on October 12 did the board or anyone on its behalf communicate to the Union or the employees any disavowal of Jones act of apparent authority. Moreover, during 1992 the board and its individual members rebuffed the attempt of employees to discuss the matter with them and hid behind the skirt of their administrator.

Respondent's board of directors cannot have it both ways, if it alone had the authority, it had the responsibility to meet the employee representative, to communicate some formal disavowal of Jones' action and to make the second and formal offer of recognition. It did not do so and I find that Jones had both the actual and apparent authority to act in this regard on behalf of the Respondent.

Otherwise, it is well established that an employer is bound by the acts of those of its officials who are in charge of the day-to-day operations at its facility and who possess actual authority, or at the very least, apparent authority, eith [sic] respect to labor relations matters[.] [Citations]. Here the credible testimony of record shows that Jones verbally agreed to recognize the Union when the demand and petition were presented to her on January 24.[2]

ALJ Opinion, page 10; *J.App.* at 28.

However, the union's refusal to invoke its rights pursuant to 29 U.S.C. § 159(c)(1) and

---

1. In the instant case, the union could have satisfied both elements of the statute, i.e. (1) a *substantial number of employees* wished to be represented for collective bargaining—allegedly 41 of 44 employees had executed union authorization cards requesting representation, and (2) the respondents' continuing refusal to recognize the union as their representative bargaining agent. *See, e.g., Bituma Corp. v. N.L.R.B.*, 23 F.3d 1432, 1435 (8th Cir.1994)(representation petition filed in May 1992, pre-election hearing conducted in June 1992, election conducted in July 1992).

An NLRB certification of union representation is effective *immediately* and imposes an *immediate* duty upon the employer to bargain in good faith with the union unless the certification is contested, in which case it becomes effective immediately upon enforcement by the appellate court. *See N.L.R.B. v. Raven Industries, Inc.*, 508 F.2d 1289, 1292 (8th Cir.1974).

2. Contrary to the ALJ's characterization of Joint Exhibit #1 (*J.App.* at 1516) as an indicia of Jones's direct or apparent agency to commit her principals to policy decisions, the letter conveys

realize immediate union recognition and ensure the immediate commencement of contract negotiations as it purported to demand, in lieu of virtually sitting on its hands for eight and one-half months between January 24, 1992 and October 12, 1992, lends credibility to the respondents' arguments that the union, with the aggressive assistance of the discharged LPNs and other employees, initiated and pursued a covert effort to intentionally create a crisis with state authorities that would result in a decertification of the facility, a state-forced receivership, and displacement of the respondents' officers and board of directors, without imperiling employee job security.

Disregarding the ALJ's running editorial commentary interpreting the evidence, and relying upon an objective review of the record as developed upon direct and cross examination of the government's witnesses, voluminous daily patient/residents hospital records, other documentation, and the testimony and reports of impartial state investigators and an independent impartial agent retained by the respondent to determine the causes for its state decertification within 110 days of the initial union's ultimatum, the record of evidence discloses a picture materially in conflict with the ALJ's journalistic resolution and casts a shadow of serious doubt upon his impartiality in arriving at a disposition of the issues before him.

From the direct testimony of Debra Timko, the organizer for the Service Employees Union, the source and malevolence of the animus between the parties is apparent and needs no assignment. At a meeting between the employees on September 22, 1992 at the Lisbon Village Hall, Timko cast the tenor of the future relationship between the parties:

Q. Now what did you say to the people before they signed that? Did you say anything to them?

A. That this was a commitment to one another, to stick together for the duration of the campaign. And that we

wanted to make sure that management knows who exactly is for this Union.

By declaring their support publicly together, they would be committed to each other, and help each other out for the duration of the campaign.

Q. And that you wanted the—

A. Oh, by taking this petition in, that we decided at this meeting that there are three ways that the Union can be recognized.

The first is to ask the boss, and the recognition be granted.

The second way is to have an election.

The third way is to have a bargaining order issued.

*J.App.* at 1657–58.

Ignoring the conventional non-confrontational practice "to ask the boss, and the recognition be granted," the Union elected to pursue a more hostile approach:

We chose to what we call, *MARCH ON THE BOSS, OR DEMAND RECOGNITION FROM THE EMPLOYER.* We decided that we would do that on Friday, the 24th.

*J.App.* at 1658. (Emphasis added).

On January 24th, Timko and a defiant group of 28 to 30 employees, plus spouses and children, marched en masse into the OH facility to demand recognition from the employer:

Q. Okay. Now could you tell me then what happened on Friday, January 24th, 1992?

A. On the 24th, every—

Well, we had over—about 28 to 30 people, plus spouses and children with us at McDonalds.

We met there and passed out a petition to everyone. It was on a cream color parchment paper.

the employer's offer, as drafted by its legal counsel, to recognize the union as the employee's bargaining representative conditioned upon the union's agreement to accept, among other terms, a definition of the employee bargaining unit, and an agreement by the union to negotiate directly

with the respondent's legal counsel. Obviously from the letter, Jones was merely a messenger or a conduit to open a dialogue between the union and respondent's legal counsel. The respondent's proposal was rejected by the union.

We said that we would go over to the home, go into the home, but to be quiet. Just go into the entrance.

We knew that the residents wouldn't be around, because they would be at workshop on that day.

We would have Mary Jane come out to meet us, and demand that she recognize our Union.

So we all walked over, crossed the street together. We went into the home. We were in the hallway when you first enter the home. And we saw Judy Manning. I told her that I was Debbie Timko from the Service Employees Union and we were here to see Mary Jane Jones. She said, "fine, I'll go get her."

She went over into the kitchen area, I assume. She got Mary Jane Jones. Mary Jane came out smiling. I extended my hand to her. I said, "I'm Debra Timko, international Union representative for the Service Employees International Union."

She said, "Oh, I'm sorry. I can't shake your hand, because I have stainless steel cleaner all over it. I've been working in the back."

I said,—

I gave her the petition. It was not sealed. It was not folded. It was on this size paper.

I gave her the petition. And I also gave her a letter, which was in an envelope and sealed.

I said, "We, the people here today, have formed a Union with Local 627. *WE DEMAND THAT YOU RECOGNIZE OUR UNION. WE KNOW WHAT OUR RIGHTS ARE. WE WILL DO WHATEVER IT TAKES TO WIN RECOGNITION OF THE UNION, AND THE RESPECT THAT WE DESERVE.*"

I also said, *"WE'RE ALSO HERE TO PUT YOU ON NOTICE THAT IF YOU MESS WITH ONE OF US, YOU MESS WITH ALL OF US."*

*J.App.* at 1660–62. (Emphasis added).

Subsequent to the initial confrontation between the parties, the Union became progressively more contentious in implementing its covert plan to unionize the facility as demonstrated by Timko's testimony:

Q. And your understanding of that term is that, *IF A RECEIVERSHIP IS APPOINTED, EXISTING MANAGEMENT IS KICKED OUT, BUT EVERYBODY ELSE GETS TO KEEP THEIR JOBS?*

A. *CORRECT.*

Q. And a receiver can be appointed any time that a home is not in compliance with the conditions of its certification or license, is that correct?

A. That's correct.

*J.App.* at 1681.

Q. And you, when those concerns first surfaced, you had, at least, based on your past experience, a feeling that there were statutory or regulatory factors that you could use, is that true?

A. *THE UNFAIR LABOR PRACTICES. THINGS LIKE THAT.*

Q. How about with respect to the agencies that regulated the homes?

A. Oh, definitely.

Q. Sure. You knew that the agency that regulated homes like Opportunity Homes had some say in whether the home would stay open or not, is that correct?

A. Oh, yes. Definitely.

*J.App.* at 1684–85.

Q. *ALL RIGHT. SO AS I UNDERSTAND IT THEN, YOU TOLD EMPLOYEES AT OPPORTUNITY HOMES TO CALL VARIOUS STATE AGENCIES AND REGISTER CONCERNS WITH THOSE AGENCIES, IS THAT CORRECT?*

A. *YES. WE AS A GROUP CALLED WHEN THERE WAS A PROBLEM.*

*J.App.* at 1685.

A. (continuing) This is what prompts people to organize is that they have gone through the procedures at the home, talked to management, have not been able to get problems solved, and realize they don't really have or don't know all

their rights and don't have enough power on their own. So they contact us and we're able through our resources, with our Research Department, our Legal Department, whatever, to educate people of their employee rights.

So, in this case, when people contacted us about organizing, it was in *DECEMBER OF 1991.*

Q. And this was Opportunity Homes?

A. Yes.

Q. *AND THAT'S WHEN YOU STARTED YOUR EDUCATION PROCESS, EDUCATING THEM ABOUT THEIR RIGHTS?*

A. *WHEN THEY FIRST MET WITH CAROL AND KATHY ON JANUARY 6TH, YES.*

Q. All right. So, as I understand it, beginning January 6th of 1992, you started educating employees of Opportunity Homes of their rights, is that correct?

A. Right.

Q. And the rights that you had started educating them about were, among other things, the right to raise matters of concern to various state agencies, right?

A. That's correct.

Q. All right. And did you indicate to—In conjunction with this teaching and education that you gave them starting in January, you also mentioned, did you not, the prospect of the state performing inspections of whatever concerns they raised at the state. Is that correct?

A. It was my understanding that the state would come in if they found the complaints to be—I don't know what the word for it—if they warranted an inspection, if they were serious enough and endangering the residents to warrant an inspection.

Q. *THE STATE WOULD INVESTIGATE?*

A. *YES.*

Q. *AND TAKE ACTION?*

A. Possibly. Like with OSHA. They come in if there's imminent danger.

Q. *AND OTHER STATE AGENCIES COME IN AND DO INVESTIGATIONS, TOO, RIGHT?*

A. *CORRECT.*

Q. *AND YOU TOLD THEM THAT IN JANUARY OF '92?*

A. *YES.*

*J.App.* 1687–89.

Q. And you also discussed with them that the state looked at stuff that affected residents' care very seriously, is that correct?

A. Yes.

Q. And the state would take whatever action necessary when it found problems with patient care to correct those problems, correct?

A. Such as short staffing, you mean?

Q. Such as anything.

A. Yes.

Q. The state would do what it took to correct all those problems, right?

A. Correct.

Q. All right. And did you also discuss with them that one of the things the state could do to correct those problems was take over the facility, if it deemed necessary?

A. When the captive audience was held on April 14th, then, when Rick said that the home was going to close and the residents were going to be shipped to YDC, that's when we started, you know, really looking into the law, saying, you know, can they close this home or can a receiver be appointed and that's when we found out that, no, the home would not close, that a receiver would, in fact, be appointed.

*J.App.* at 1690–91.

Q. *OKAY. SO PRIOR TO—IN THE PERIOD OF TIME JANUARY TO MARCH, THE EMPLOYEES OF OPPORTUNITY HOMES KNEW THAT, IF THE STATE FOUND THEIR COMPLAINTS VALID, THAT THE STATE WOULD STEP IN AND TAKE CORRECTIVE ACTION, ANYWHERE FROM ORDERING MANAGEMENT TO CORRECTING THE STUFF TO*

*TAKING ACTION OF EVEN A MORE SEVERE NATURE, IS THAT CORRECT?*

A. *YES.*

J.App. at 1692–93.

Q. *LET ME ASK YOU IF THE EMPLOYEES AT OPPORTUNITY HOMES THAT YOU MET WITH AND YOU DISCUSSED WITH THEM THIS STATUTE, OHIO REVISED CODE 5123.191, WHICH—AND I ASSUME YOU INDICATED TO THEM THAT THIS ALLOWS THE STATE TO COME IN, KICK OUT MANAGEMENT, AND LET EVERYONE ELSE KEEP THEIR JOBS, RIGHT?*

A. *WE DIDN'T PUT IT IN TERMS OF WE'RE GOING TO KICK OUT MANAGEMENT. WE PUT IT IN TERMS OF THERE IS A PROVISION THAT WILL PREVENT THE HOME FROM CLOSING AND IT'S CALLED RECEIVERSHIP AND THE COURT MAY APPOINT A RECEIVER TO TAKE OVER THE HOME UNTIL SUCH TIME IT'S BROUGHT UP TO STANDARDS AND PUT BACK IN ITS PROPER PLACE.*

Q. *ALL RIGHT. AND TAKING OVER THE HOME, YOU'LL AGREE WITH ME, MEANS THAT THE COURT APPOINTS NEW MANAGEMENT TO RUN THE HOME, CORRECT?*

A. *THAT'S CORRECT.*

J.App. at 1694.

In considering the suspension and ultimate discharge of the four LPNs, a habilitation aid, and a direct staff aid, this appellate review is confronted with the long-standing admonition of the Supreme Court in *N.L.R.B. v. Local Union No. 1229*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) wherein the Court dictated that firing television technicians for distributing handbills which disparaged the employer's product and business policies in a manner reasonably calculated to harm the employer's business, acts far less egregious than those charged in the instant case, constituted legitimate termination for cause. The Court ruled that *"[t]here is no more elemental cause for discharge of an employee than disloyalty to his*

*employer." Id.* at 472, 74 S.Ct. at 176. (Emphasis added). "Congress, while safeguarding, in § 7 [of the National Labor Relations Act, 29 U.S.C. § 157], the right of employees to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection,' [note omitted] did not weaken the underlying contractual bonds and loyalties of employer and employee." *Id.* at 473, 74 S.Ct. at 177.

The Court subsequently further inferred at page 475 that "[t]he legal principle that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough."

These basic principles were echoed by the Seventh Circuit in *N.L.R.B. v. Knuth Brothers, Inc.*, 537 F.2d 950 (7th Cir.1976) wherein employees had been discharged for disclosing confidential business information which could have harmed the employer's business relationships:

Section 7 ... *does not immunize an employee from discharge for acts of disloyalty or misconduct* merely because those acts were associated with protected activity. *Id.* at 953. (Emphasis added).

The court concluded:

In revealing the information, [the employee] *acted in reckless disregard of his employer's business interests.* Respondent has the right to expect its employees to use greater care in using information acquired in the course of their employment. Failure to use such care was an act of disloyalty to respondent. *His avowed purpose of aiding the organizational campaign is insufficient to protect him from the effects of his misconduct and constituted cause for discharge.*

\*    \*    \*    \*    \*    \*

Section 10(c), 29 U.S.C. § 160(c), of the Act protects the employer's right to protect its business interests and, if necessary, to discharge an employee for cause. Congress, while safeguarding in section 7 the right of employees to engage in concerted activities for the purpose of collective bargaining, did not intend to weaken the underlying contractual bonds and loyalties essential to

a suitable employer-employee relationship. It was the purpose of the Act to strengthen, rather than weaken, the cooperation and cordial relationship between the employer and his employees. *The power of the Act cannot be used as a pretext for infringing the employer's rights. Id.* at 956–57. (Emphasis added).

Again, in *N.L.R.B. v. Red Top, Inc.*, 455 F.2d 721 (8th Cir.1972), a case that reviewed an employee conspiracy to remove an unpopular manager, such conduct was not considered a protected activity. *Id.* at 725–26. The employee provided housekeeping and janitorial services to hospitals. The motivation of the employees in making various unfounded accusations against their manager to company higher-ups was to pressure him into ignoring their substandard job performance. *Id.* at 727. In addition, the employees threatened to complain about the employer to the management of a hospital which did business with the employer if certain demands were not met. The court ruled that this method of concerted action was not protected by 29 U.S.C. § 157 because it constituted an act of disloyalty which was clearly designed to harm the employer economically by interfering with its customer business relations. The Court concluded:

> On the record we cannot hold that the finding by the Board that the three employees were engaged in protected activities is supported by substantial evidence. A considerable part of the offensive activity did not fall within the perimeter of protected activity, but, assuming arguendo that the employees were engaged in protected activity, there is a point where their methods of engaging in that activity would take them outside the protection of the Act.

*Id.* at 726. *See also Squier Distributing Co. v. Local 7, Intern. Broth.*, 801 F.2d 238 (6th Cir.1986); *Hagopian & Sons, Inc. v. N.L.R.B.*, 395 F.2d 947 (6th Cir.1968).

Before considering the propriety of the employee suspensions and subsequent discharges against the respondent's assertions of employee unlawful interference with the employer's commercial interests as addressed by the Supreme Court in *N.L.R.B. v. Local Union No. 1229*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) and its progeny, the union/employees' expressed hostile animus during the initial confrontation of the parties on January 24, 1992, coupled with the union/employees' covert plan to replace the OH officers and directors through a state-imposed receivership without jeopardizing employee job security admittedly explored by the union and its national legal council and implemented by a program of "educating" the employees to generate complaints against the respondents with various state regulatory agencies, it is significant to note that, during the approximate ten years of respondent's existence, the irrefutable documentation that is a part of the record herein, discloses that, historically, the ODH and other state regulatory agencies considered the respondent to be a well operated and managed health care facility.

Although routine regulatory annual surveys did surface 10 or 15 minor oversight infractions, ODH records appearing as exhibits in this proceeding confirmed that prior to January 24, 1992, respondent had never received a conditional citation that warranted decertification, let alone a notice of decertification anchored in *three* conditional citations.[3] It is also significant to note that after the January 24, 1992 confrontation, respondent received four times as many minor oversight citations than it did in 1991 and three times the number it received in 1990; that from the 1990 ODH surveys and thereafter, all five LPNs suspended in May of 1992 and ultimately terminated in June of 1992 (the four LPNs at issue herein plus Joyce Carnes, a pro-management LPN) constituted respondent's entire full time nursing staff. The ODH records also confirm that the seven 1990 and the twelve 1991 infractions had all been timely corrected to the satisfaction of ODH, attesting to the excellent performance record of the four LPNs here in controversy. It is also worthy of note that during the two

---

**3.** The record does not define the term "conditional citation;" however, it does imply that a "conditional citation" is one or more of seven citation categories that constitute "resident risk infractions" that warrant or mandate decertification.

years next preceding the disasterous April 1992 ODH survey, its records reflected no written or telephone complaints lodged against the respondent.

In light of the foregoing recorded revelations conveniently ignored by the ALJ, reasonable minds are prompted to *QUESTION THE REASONS FOR AND THE SOURCES* of voluminous telephone complaints received by the ODH during February and March of 1992 which resulted in its premature unannounced annual survey that commenced in early April 1992, just over two months after the union employees "march on the boss" confrontation.

The discharge of the four LPNs here in controversy may be justified without resort to an evaluation of the partisan testimony developed by the adversary parties, but solely by nurses' notes, med sheets, treatment sheets, shift reports, monthly BM sheets, individual resident/patient care records, bowel/bladder schedule consensus sheets, medical charts, and medical supply inventories, all of which were memorialized in their own handwriting, and which are beyond discrediting even by ALJ Beddow, Jr. The identified report entries, which anchor the ODH's three conditional citations and approximately 45% of the 57 specific infractions, are directly attributable to the discharged LPNs by the ODH survey team.[4]

The greatest concern of the OH investigators was resident/patient care imputed to a dereliction of professional performance by the LPNs. Infractions ascribed to the professional conduct of the LPNs included, but was not limited to, repeatedly ignoring physicians' orders, repeatedly failing to notify physicians of resident/patient deteriorating physical conditions to ensure timely required medical attention and treatment, repeated failure to monitor and timely administer and/or discontinue required medication, and failure to properly monitor and maintain resident/patient daily medical records. The life-threatening consequences of the identified professional malpractice was demonstrated by the proximate circumstances that attached to the factual support of the illustrated examples of LPN conduct which was attested by recorded entries in the daily resident/patient charts and the findings and conclusions of the ODH survey. Any one of the infractions would, in and of itself, have supported discharge for cause.

The individual termination notices of the discharged LPNs listed the reasons for discharge and correlated their individual participation that were correlated with entries charted in resident/patient daily medical records.

An in camera review of but a few illustrative extrapolations from the credited daily and other resident/patient medical charts cited by the findings and conclusions of the ODH mirrored the proclivity of the discharged LPNs to pursue a course of unprofessional conduct commencing in January 1992 and continuing thereafter until their suspension and ultimate termination on June 17, 1992, that exploited and threatened the well-being of physically and mentally handicapped charges under their supervision for observation and treatment, and which contributed to the ODH notice of decertification of May 13, 1992.

Typical of the degree and extent of the nonfeasance charged to the four dismissed members of the nursing department, each of

---

4. It is uncontested that the listed job duties were the direct responsibility of the discharged LPNs:
   Receive report from the previous ... shift nurse.
   Pass medications as needed.
   Charting of nurses notes, med sheets and treatment sheets, shift to shift report. Implement new orders/changes as needed.
   Prepare next months: nurses notes, treatment sheets, monthly BM sheets, individual resident care record, bowel/bladder schedule sheets, daily hygiene sheets, Roger's water intake sheet, daily census sheets and put out for the month.
   Keep medical charts current: three months records on chart at all times, pull least current month and file in file cabinet.
   Inventory medical supplies q month.
   Check all nursing charts for complete documentation: initials on MAR, treatment sheets, signatures etc.
   Check flow sheets and bowel/bladder sheets of direct care staff.
   Check nursing treatment sheets and be sure they reflect consistency month to month.
   Perform similar and related duties as assigned.
   Job Description—Nurses, *J.App.* at 1090–91.

whom had supervisory responsibility for observation and care of a resident/patient's "stoma," a surgically created cavity in the bowels attached to an ileostomy bag, were ODH citations for the failure of the OH nurses to properly chart the condition. Because infection or blockage of such an incision is dangerous and can be fatal, OH policy directs that the attending nurse must immediately report any irritation, swelling, or other complication symptomology to a physician. ODH inspector Carol Kaser discovered that the resident/patient's stoma was inflamed and had been in that condition for a protracted period of time. The resident/patient complained of pain. However, although the nurses' notes disclosed that the stoma had been inflamed since January 1992, that it was bright red with granulated distended white areas during the entire month of March 1992, and that it had hemorrhaged on at least three separate days (March 12, 13, and 18, 1992), the medical records did not manifest whether the resident/patient's physician had been notified of the resident/patient's portending symptomology, or if any treatment had been requested or administered since January 1992. Because each of the nurses here in controversy had cared for this resident/patient at various times during the relevant period,[5] each had failed to discharge a critical professional job responsibility to a health-threatening degree. Professional dereliction of this magnitude standing alone justified the termination of the nurses.

Another equally serious infidelity to the professional ethic of responsibility by the nurses involved their conduct concerning a physician's order for the syringing of a particular patient.[6]

On February 5, 1992, as a result of the LPNs' professional misfeasance, a hospital which had conducted tests upon the involved OH resident/patient reported that the patient suffered from a toxic level of prescription medicine (Tegretol). A physician's order signed on June 11, 1991, eight months earlier, had directed the syringing of this patient when necessary to prevent a toxic medication accumulation and dehydration. The toxic concentration of Tegretol in the resident/patient's blood evinced that the nurses had totally disregarded the physician's syringing instruction. The nurses' notes reflected that no syringing of this patient had occurred in the days following February 5, 1992, nor had any nurse consulted a physician to determine if Tegretol should have been discontinued. Instead, the nurses continued to administer the drug until February 8, 1992. On that day, Nurse Milhoan, for the first time, obtained a physician's telephone order[7] from Dr. Milligan, who was on call for Dr. Stevenson (the resident/patient's primary care physician),[8] which directed that Tegretol should be discontinued until Monday, February 10, 1992, and directed that Dr. Stevenson should be immediately consulted for further instruction on the continued administration of Tegretol and syringing. On February 10, 1992, Nurse Redmond, who was on duty on February 10, disregarded Dr. Milligan's order. Instead, without consulting Dr. Stevenson and in defiance of Dr. Milligan's direct order and acting without authority, entered a false written entry on the patient's medical chart (plan of treatment) that the patient's syringing

5. At any moment, a single full-time LPN was on duty at OH.

6. "Syringing" is forcibly administering oral intake of fluids by use of a bulb syringe to patients who refuse to voluntarily ingest adequate quantities of liquids. The therapy is designed to avoid dehydration, potentially toxic accumulations of medications within a subject, and other health threatening complications. Syringing is an unpleasant and unpopular assignment. After January 29, 1992 conflict, and the "march on the boss," coupled with the union/employee's ultimatum to "do whatever it takes to win recognition of the union," the nurses resisted and refused syringing an identified patient despite a standing doctor's order to do so when necessary.

7. A physician's telephone order is a written memorialization by an OH nurse of a doctor's prescription for a resident recited to the nurse via telephonic conference. The document is later delivered to the doctor for his signature to confirm the prescription.

8. Neither of these doctors had prescribed Tegretol for his client. Rather, that drug was ordered by Dr. Tamulonis, the physician who supervised the patient's medication regime. According to Manning, Milhoan should have telephoned Dr. Tamulonis regarding this issue.

order had been rescinded on February 10, 1992—an act bordering on professional malfeasance.

Consequently, in an apparent attempt to vindicate herself and the other nurses' continuing neglect, Nurse Redmond informed ODH inspector Carol Kaser during the critical ODH inspection on April 9, 1992 that a physician's "stop order" of February 11, 1992 (which Redmond conveniently could not locate) had directed that the patient at issue should no longer be syringed, and misrepresented that the OH management had ignored that directive and was expecting the nurses to continue the syringing treatment. This verbal representation by Redmond resulted in a citation against OH for requiring its nurses to perform syringing treatment in the absence of a doctor's order.

*However, a subsequent search of OH's records disclosed no written physician's stop order of the type charged by Redmond.* Contradicting Redmond's representations, the computer generated standing physician's orders [9] for the months of March and April, 1992, which were reviewed and signed monthly by Dr. Stevenson, disclosed that the *resident/patient should have continued to have syringing treatment* when needed to prevent dehydration and drug toxicity. The computerized physician's orders were typically reviewed to evaluate patient treatment around the 15th day of each month for the following month. Accordingly, if Redmond had received a physician's syringing charge order on February 11, 1992, as she attested, OH policy required her to immediately notify the pharmacy of the change, which she had not done. In addition, she would have been required by standard OH practices and written rules of procedure to inform the OH dietary department of this modification, as well as to immediately circulate an in-service memorandum to advise the other staff members that syringing should be discontinued for this individual. However, the dietician had not been so notified, and her records continued to reflect that the syringing order was in effect during March and April, 1992, and no pertinent in-service sheet had been circulated. Despite the uncontroverted recorded evidence discrediting their proclaimed innocence, the misfeasant nurses insisted that the syringing order had been withdrawn by a physician on February 11, 1992, or asserted that syringing never had been prescribed but rather the original June 11, 1991 syringing order had been forged.[10] The nurses' refusal to execute a standing physician's treatment order for an OH patient in disregard for the client's health, their fabrication of a nonexistent alleged doctor's stop order, and their transparent attempt to create certification difficulties for OH consequent to this manufactured incident, was (like the stoma incident) independently sufficient to justify the termination of the nurses.

A third infraction which generated several ODH citations concerned a physician's prescription for a medication (Ativan) which had been altered. The January 1992 physician's resident/patient order sheet for a resident/patient reflected final entry of a notation in Manning's handwriting dated January 1, 1992 indicating that Ativan had been ordered for this particular individual by Dr. B.N. Bhat. The practice and procedure for protecting the integrity of the physicians' order against unauthorized amendment or change mandates that a line be drawn from the last word or sentence entry on the chart to the doctor's signature. Apparent from an examination of the resident/patient's medical

9. The monthly physician's orders for each OH patient are computer generated by the outside pharmacy with which OH does business, I.P.S. of Warren, Ohio. The nurses are responsible for ensuring that I.P.S. has complete and accurate records of the medication treatment program prescribed by various doctors for the respective resident. These statements are reviewed and executed by the patient's primary care physician at the beginning of each month.

10. On April 11, 1992, after learning of the ODH charges concerning the syringing order and the nurses' disclaimed culpability charging that the order had been revoked or was invalid, Manning telephoned Dr. Tamulonis, the resident/patient treating physician who ordered the medication and syringing. He confirmed that the subject resident/patient should have continued to receive Tegretol and that syringing should have been implemented when appropriate. A written telephone order of April 10, 1992, signed by Dr. Tamulonis on April 16, 1992, confirmed this prescription. *J.App.* at 1462.

chart, someone had altered Dr. Bhat's order to extend the line to traverse the Ativan prescription, thus creating the illusion that Manning had added this entry subsequent to execution of the form by Dr. Bhat. *J.App.* at 1437. It was apparent that someone had also obviously tampered with Dr. Bhat's original telephone order concerning this patient which had been recorded by Nurse Milhoan on December 2, 1991 by an insertion, not in Milhoan's handwriting, that discontinued Dr. Bhat's order. *J.App.* at 1481.

A physician's order sheet and progress notes [11] generated by Dr. William Price on behalf of this resident/patient included a valid January 16, 1992 entry directing discontinuance of Ativan. Consequently, the forger apparently intended to foster an image that Manning had altered the December 2, 1991 order to implicate the nurses by creating an impression that they were negligent in failing to discontinue the administration of Ativan to the patient. Moreover, in light of a valid stop order of January 16, 1992 issued by Dr. Price, the forger altered the January 1, 1992 physician's orders of Dr. Bhat to appear that Manning had added a January 1, 1992 Ativan order to reconcile the subsequent January 16, 1992 stop order for the same pharmaceutical. The two forgeries together created an illusion that no valid Ativan order existed between December 2, 1991 and January 1, 1992, despite the nurses' administration of this drug to the patient during this period. Indeed, charges that Manning had falsified these entries with intent to "frame" the nurses were advanced in a letter signed by the four union-affiliated nurses and mailed to the Ohio Board of Nursing.

However, ODH inspector Carol Kaser attested that ODH's investigation determined that the forged penmanship was not written by Manning. Only Manning and the five LPNs had access to these medication order records. Accordingly, OH management was justified in concluding that the forgeries were written by one of the nurses, with the manifest intention of discrediting Manning. In any event, although the nurses had regular access to these documents, none reported these alterations to OH management prior to the ODH evaluation.

Carol Kaser, a registered nurse who was assigned to and accompanied the ODH inspectors and who was a non-partisan witness, testified that the citations supporting the decertification notice were prepared from the personal observations of the survey team. She testified that the indecorous unprofessional nursing care that she observed consisted of (1) continued administration of discontinued medication; (2) missing progress notes which precluded a tracking resident/patient treatment; (3) deficient stoma care management; (4) negligent stoma treatment and failure to alert and seek physician assistance; (5) drug administration errors; (6) issuing questionable medication orders without advising assigned original resident/patient nurses; and (7) the disarray of all nurses' records and charges:

Q. Well, what is your recollection?

A. Okay, my recollection about going into specific dates—articles and documentation that was presented was medication that was supposedly to be discontinued that was not discontinued.

We had progress notes missing that we couldn't track actual client care.

There was one client that had a stoma that we couldn't find the follow up care for.

There was a medication order that was written without the original nurse's awareness. It looked like the order had been added after the medication order had been taken from the nurse.

The nursing records were disjoined and fragmented, you know, again, making it hard to track. We couldn't track the actual nursing care.

*J.App.* at 2162.

Q. With respect to the follow up care of the stoma patient, what was your concern with what you didn't see in the documents?

A. When we went to check the client, we looked at the client—what triggered it was that the client was on a behavioral program for tearing his stoma bag off.

---

**11.** These documents reflect physician's orders for a patient subsequent to a medical examination.

So we went to look at the stoma was actually the cause of him pulling the bag off or if there was actual—actually a medical problem. And when we looked at the stoma, it was kind of a bright red color and it had these lumpy kind of off colored areas to it, and it was red and irritated. And he complained of pain in that area.

And then what we tried to do was go back and track the record to what all had been done for the client. And there had been a cancer screening that was done, but there was no record of it on the chart. And we couldn't find on the chart where, you know, the doctor had been notified, what kind of follow up care had been given—uh—if the medical director had been notified of the current condition of, you know, the stoma as it—as it was when we looked at it.

*J.App.* at 2164–65.

Q. Do you expect to see follow up care charted on nurses notes, or is there some other type of document that that information can be put down on?

A. There's several ways that nurses or health care individuals can document that. They can document treatment on what's called the medication administration record. They can document it in nurses notes. Hopefully, the physician will document it in the progress notes. Or, if there's telephone orders, sometimes the physicians will write a note or something on an order saying that, you know, this order is being given for—for this—for this reason. And it depends on facility policy actually how much documentation, you know, that the facility actually wants completed on each client.

Q. What are your expectations as to the documentation of follow up care for a stoma patient? Do you expect it to be in some document or none?

A. It needs to be—if they're giving treatment and I emphasize—I don't really emphasize if—and it comes back to we didn't have the document—documentation made available to us, but there should be some form or type of documentation so we can look and see what type of care was actually given to the client. If the physician was notified, that should be documented someplace so we'd know that the physician knows that that stoma looks like that.

Q. Well, I don't—

A. Meaning why?

Q. —yes.

A. It lets the shifts know at least and the facility know that the care is being—being rendered. That somebody has been notified that the stoma looks red, lumpy—it's irritated, and they're complaining of pain. You know it's just a—a means of communication in giving consistent health care to that client.

Q. And who is supposed to do that documentation?

A. It would depend on the—it would depend on the facility policy. Nurses, LPN's, anybody—anybody that would really have any direct hands on care with that could notify or write in the direct care log, you know, that—that there's a problem with the stoma.

Q. Let me direct your attention to the problems you observed with the medical orders.

A. Uh-huh.

Q. What—what specifically were you seeing that was (inaudible)?

A. What I noticed and what the team noticed—again, it was a team, you know, survey—what we noticed was medication that had been discontinued but not discontinued. In other words, it was discontinued like in December, but it was still being followed through in April. We saw meds that were—the one that I can think of it the Traviset—that the client had had the Traviset discontinued, but it was still given a couple months after it had been, you know, given (phonetic).

There was an—an order and I can't remember if it was for Ativan or Mellaril, but one order, there was a question of whether or not it had been added or deleted after a physician had—had signed the order.

Q. What was the problem with that?

A. *IF SOMEBODY IS ADDING OR DELETING ORDERS, THEN THEY'RE FALSIFYING THE RECORDS OR, YOU KNOW, IF THERE'S NO WAY FOR U.S. TO TRACK WHAT THAT CLIENT WAS ACTUALLY SUPPOSED TO GET—ARE THEY SUPPOSED TO GET WHATEVER—I CAN'T REMEMBER A SPECIFIC MEDICINE INVOLVED.*

When I did talk to the nurses, the nurse that originally took the order brought it to my attention that that was not her signature or not her—her handwriting. When I took it to the director of nursing, you know, you could tell the two different handwritings meaning somebody obviously had added, you know, the order to it. We just didn't know who.

Q. With respect to the nursing orders— I'm sorry, the nursing records being disjointed, what specifically were you observing that caused you concern on the nursing records?

A. Progress notes that were missing or misplaced or filed away that were not available to us, so we could actually see the care that was rendered to the clients. Some of the nurses notes were short meaning there was only one or two lines. And then there'd be a couple days when there was nothing. And then in between those two days, something major would happen whether it was the stoma or—you know, we'd go back and try to track the order to find out where the order had actually, you know, came from. Why—how was this physician notified, and we couldn't find charging to indicate that, you know, the reason why the physician was notified.

Q. With respect to the med pass that you observed, did you have any concerns for the medical safety of the residents involved?

A. Yes.

*J.App.* at 2165–70.

Q. Now let me ask you—uh—did anything you saw in your survey lead you to conclude that patients were being placed at risk by the nursing service?

A. Nursing services?

Q. *DID ANYTHING CAUSE YOU TO CONCLUDE THAT THE NURSING SERVICES BEING DELIVERED TO THOSE RESIDENTS WERE IN SUCH A CONDITION THAT THE RESIDENTS WERE BEING PLACED AT RISK?*

A. *YES.*

Q. And what was the risk that you saw those residents being subjected to?

A. The—the risk was one having the orders added after the physician had signed it was one risk.

Another risk was—

Q. What's the risk there? Risk of what?

A. The risk of—that comes out of that is that you don't know what the client is supposed to get. You don't know if the med is supposed to be discontinued—if the med is actually needed or not. That client may very well need the med, but if a physician hasn't wrote the order for that, then it's an illegal transcription—prescription order.

Q. What other risks did you see the residents being subjected to?

A. The unsafe med pass.

Q. Anything else?

A. Medication not being discontinued as was originally ordered by the—by the physician. And I can't—I can't recall all the rest.

*J.App.* at 2171–72. (Emphasis added).

Q. With respect to the stoma patient—

A. Uh-huh.

Q. —would a doctor visit once a month based on what you were seeing documented in the nursing records—would that be adequate follow up care for that patient or would a more frequent visits with the doctor be necessary?

A. What we didn't find was any documentation that indicated that the resident had been seen by the physician in the stoma. And I can't remember, to be honest, if, you know, there was actual times that the—that the client was seen. There was *no documentation that indicated that that stoma area had been*

*checked, that any other alternative care had been ordered for that stoma.* And that's what we looked at for the medical plan of care.

Q. Well, was what you saw, did it leave you with a conviction that—that the care was not adequate?

A. What—I don't know if I'd want to phrase that that way. What we saw was there was a lack of follow up care provided to that client. And we could not, again, see any documentation where that client had been seen for the stoma not in the nurses notes and not in the progress notes, you know, except for the cancer screening. There was an indication that there was a cancer screening that had been completed, but no results were on it.

Q. Was that the basis for your citation?

A. The basis for the citation was that the area was bright red, lumpy, irritated, and he was complaining of pain, and no documentation could be provided that a physician had been notified for that.

Q. Now the orders—the handwriting which you questioned—

A. Uh-huh.

Q. —did you show that to the Director of Nursing, Judy Manning?

A. Yes.

Q. The—with respect to the order handwriting which you questioned, did you show it to Judy Manning?

A. Yes, I did.

Q. All right. Did you ask her to show you a sample of her handwriting?

A. I asked her to write a d. We had looked as a team at some—words that other people had written, and I had asked here to write a d.

Q. Did you determine whether the handwriting was hers or not?

A. It did not appear—I'm not a handwriting ex—expert, but it did not appear to be hers. We had no idea who wrote the order in.

LPN Kathy Byers, acting as the representative of the remaining discharged nurses, reviewed and evaluated the resident/patient medical and other charts and admitted to a number of instances of the more serious indecorous professional conduct of her associates, any of which would justify dismissal for cause:

JUDGE BEDDOW: To save time, is it all right, in response to your question if she refers to her exhibit 63?

MR. STRASSBURG: Absolutely.

A. I would say the ones titled under nursing services, just like in the citation.

JUDGE BEDDOW: Refer to what page?

THE WITNESS: page 68—excuse me, 72, 73, 74, 75, 76 combination, 78, 79, 80 combination, 80 and 81 combination.

*J.App.* at 1836.

BY MR. STRASSBURG—Admission of LPN Byers on behalf of remaining discharged nurses re syringing and stoma care:

Q. Directing your attention to Respondent Exhibit No. 40, would you identify that for the record, please?

A. It looks like an order.

Q. In fact, it looks like the order involving Kevin and the syringing; right?

A. Yes, sir.

Q. And bears the doctor's signature; right?

A. Yes, sir. This is the order I turned into the sheriff that we felt was forged.

Q. So that order is forged; right?

A. This order appeared on the chart after ODH left. These are the orders that we turned in.

*J.App.* at 1838.

Q. As I understand it, an ileostomy is a surgical technique to address a problem with the intestines; right?

A. Yes, sir.

Q. And the problem is the intestines can no longer physically move the waste material out of the body?

A. Yes, sir.

Q. And the part of the intestine that is not moving the waste material is taken out and because that shortens the intestine, then the intestine is rerouted

through a surgical opening in the abdominal wall; right?

A. Yes, sir.

Q. And the thing you've got to be careful about with patients who have ileostomies is that you have to be alert for any sign that the intestines are not functioning properly; would you agree with that?

A. Yes, sir.

Q. Because the whole purpose of the ileostomy is to address a problem with the intestines not working right; correct?

A. Yes, sir.

Q. And one of the ways you can tell that the intestine isn't working properly is it doesn't yield any waste material; correct?

A. Yes, sir.

*J.App.* at 1839.

BY MR. STRASSBURG:

Q. Directing your attention to Respondent Exhibit 47, can you identify that for the record, please?

A. Yeah, these are nurse's notes.

Q. Nurse's notes for Donald, the patient we have been talking about here; correct?

A. Yes, sir.

Q. On September 15th, 1991, your colleague Lorena Howell, she charted that there was a watery drainage from the stoma; correct?

A. That isn't all she charts. She says, ilestomy bag as a third full of green colored liquid which could, in fact, indicate infection, with flecks of brown colored stool. Ostomy working very sluggishly.

Q. That is correct, that is in the chart?

A. Yes, sir, that is in the chart.

Q. On that same day Lorena Howell then notified the Director of Nursing of the resident's status and she tried to call the doctor; correct?

A. Let me read that.

Q. I highlighted it in yellow.

BY MR. STRASSBURG:

Q. On September 15th, 1991, your colleague Lorena Howell notified the Director of Nursing the status of the resident and she even tried to call Donald's doctor; correct?

A. Yes, sir.

Q. She charted that, right?

A. Yes, sir.

Q. Do you remember if you observed any drainage from Donald that you charted there on the day in question?

A. No, sir, he didn't have green drainage there.

Q. Do you remember whether you charted that you tried to call a doctor?

A. I didn't try to call the doctor.

Q. Did you try to call the Director of Nursing?

A. I don't recall if I did or not. If I saw no reason to, I probably didn't.

Q. Is it on the chart; right?

A. Yes, sir.

Q. And later on, on September 16th, Donald was found to have, at the hospital, a small bowel obstruction; do you see that charted here?

A. Yes, sir.

Q. What is a small bowel obstruction?

A. It would be just a small blockage of— if that is what it says, a small bowel obstruction is a small bowel blockage.

Q. And the small bowel is a part of the bowel; correct?

A. Yes, sir. That is an ileostomy, that is the small bowel.

Q. And a blockage of the small bowel can be life threatening; right?

A. Yes, sir. It can be.

*J.App.* at 1840–42.

BY MR. STRASSBURG:

Q. I direct your attention to Respondent's Exhibit 49, and can you identify that for me as the first page of the Ohio Department of Mental Retardation's Residential Care Facility Survey for 1992?

A. Yes, sir.

Q. Do you see at the bottom where it says, it was noted that nurse JC, CR,

RB and LM based concern about Donald's stoma, yet none of them reported it to the DON or the doctor; the first notation was found January 1, 1992; do you see that on this document?

A. Yes, sir. But just because it isn't in the nurse's notes does not mean that it was not reported. She wrote me up on—in March on this, okay, I think it when I got the writeup for this. I am not sure, and on 5–18 then MRDD comes in and she has already written me up about Donald. And she didn't read the nurse's notes, she didn't do anything: We had gone to her consistently and told her that Donald was having troubles with his stoma. One of her jobs is to read the nurse's notes.

Q. *AND WASN'T IT YOUR JOB TO CHART THAT YOU REPORTED IT TO THE DON; RIGHT?*

A. *I KNOW THAT NOW.*

Q. Lorena Howell knew it in September of '91; correct?

A. Yes, she charted it.

Q. Is there anything about the care on the charting that you did with respect to Donald that you think you could have done better?

A. Yeah, I should have charted that we told the DON, but Dr. Vargo was inconsistently. He made recommendations to Judy, he gave Judy the name of an ET nurse to call at the Youngstown Osteopathic Hospital, which she never did. There was nothing I could do about that.

Q. So as you look back you can see that you left stuff out of the nursing notes with respect to Donald that should have been in?

A. All nurses do, all nurses make mistakes, all nurses are not perfect.

*J.App.* at 1844–45.

In summary, Byers admitted that the nurses were at fault for the following ODH citations (*J.App.* at 678–764):

1. improper drug administration (p. 72 of the ODH citations);

2. improper stoma management, care, treatment and follow-up (pp. 68, 73, 74);

3. improper coordination of physician services with nursing care (p. 72);

4. improper coordination between nurses in medicine administration (p. 75–76);

5. drug administration errors (p. 78);

6. improper recording of medication errors with physician review (p. 78);

7. improper orders for Ativan (pp. 77–78).

Concerned about the portending May 1, 1992 citations issued by the ODH, respondents immediately retained the professional consulting services of Marilyn Robb on May 4, 1992 to *VERIFY* and *EVALUATE* the *VALIDITY OF THE CAUSES FOR THE CHARGED LPN VIOLATIONS CITED BY THE ODH.* Robb was a registered nurse who had been employed as respondent's Director of Nursing some years previously and was familiar with the operation of the facility. When Robb commenced her May 4, 1992 assignment to verify the causes for the ODH citations and suggest corrective measures, *THE ODH HAD ALREADY COMPLETED ITS INVESTIGATION* that had commenced in early April and issued its May 1, 1992 citations. *J.App.* at 678.

On May 13, 1992, ten days into Robb's investigation, respondents received ODH's decertification notice.

It took Robb approximately two weeks to track and verify the ODH findings and conclusions by correlation with the credited resident/patient medical charts, nurses records, physicians orders, and other material documentation.

By May 18, 1992, Robb had *VERIFIED AND CONFIRMED THE VALIDITY OF THE DEFICIENT PROFESSIONAL PERFORMANCE CHARGED BY THE ODH CITATION OF MAY 1, 1992.* Respondents on that date suspended the four LPNs here in controversy and engaged a professional employment agency which immediately provided temporary replacements to ensure qualified resident/patient care. Robb's final Quality Performance Report *REFERENCED INNUMERABLE EXTRAPOLATIONS OF NON–FEASANCE AND MISFEASANCE TAKEN DIRECTLY FROM THE RESIDENT/PATIENT MEDICAL CHARTS, RECORDS, NURSES' RE-*

*PORTS, PHYSICIANS ORDERS, AND THE ODH CITATION OF MAY 1, 1992, ANY ONE OR MORE OF WHICH WOULD HAVE SUPPORTED THE DISCHARGE FOR CAUSE OF THE LPNs WHO WERE ULTIMATELY TERMINATED ON JUNE 17, 1992.*

Confronted with the credited damaging revelations of professional nursing non-feasance and misfeasance disclosed by indelible entries, or lack thereof, appearing in the resident/patient daily medical charts, nurses records, physicians orders, and other documentation that served as the factual data source for the ODH survey citations and decertification notice, the Robb Quality Performance Report on the nurses, and the pernicious admissions against interest made by nurse Byers on behalf of her discharged associate nurses, the ALJ, in an effort to discredit *the fatal non-partisan evidentiary impact upon the government's case refused to consider the impartially developed reasons for terminating the discharged nurses with the following legally and factually incorrect inane statement.*[12]

> Despite the Respondent's elaborate effort to find fault with the LPNs, both as a group and individually, *I FIND IT UNNECESSARY TO ANALYZE EACH INSTANCE CITED* because it otherwise is shown that these "reasons" were essentially documented after the fact (Robb's so called "investigation" *WAS AFTER THE SUSPENSION* and the stated purpose of the "investigation" was to justify a preordained conclusion). ALJ opinion, page 19; *J.App.* at 37. (Emphasis added)

The ALJ references no factual support for his undefined conjectured "reasons" that were documented "after the fact" for the purpose "to justify a preordained conclusion."

Moreover, common sense dictates that the purpose of an investigation in most instances *IS TO DETERMINE THE PROXIMATE CAUSE OF A PAST OCCURRENCE.* That was precisely the purpose of both the ODH and the Robb investigations. Robb's

assignment was to determine the validity of the ODH-charged deficient professional performance. To accomplish her commitment, she verified and correlated existing ODH findings and conclusions incorporated into its citation notice with existing OH medical records reflecting upon the professional performance of the discharged nurses. She concluded that the *ODH's* findings and conclusions were supported by the existing entries, or lack thereof, appearing in the OH medical records. How a simple comparative analysis of records constituted an "investigation" that was conducted by Robb after the suspension of the LPNs with the stated purpose to justify a "preordained conclusion" constitutes a figment of the ALJ's injudicious reasoning, defies logic and common sense, and reflects a biased mindset and an effort to justify his result oriented disposition.

The record of evidence developed during the trial of this action is replete with other instances that discredit the ALJ's decision, the most telling of which is that subsequent to the termination of the discharged LPNs for unprofessional conduct in the performance of their duties, there was a material improvement in the quality of nursing care that occurred after they were replaced by temporary LPNs and subsequently by permanent LPNs, resulting in the certification and continued operation of OH's health care facility.

For the reasons disclosed by the record in this case which, in my opinion, reflect an egregious demonstrated abuse of discretion by the ALJ in the disposition of this controversy assigned to him for impartial adjudication, I cannot endorse his obviously result-oriented decision and would therefore set aside all relief granted by the Board to the nurses.

In considering the termination of Blaine Ritchie, a Direct Care Staff aid, a summary of the facts is in order. On May 24, 1992, an OH resident/patient fell in the facility's shower, causing injury to himself while in Rit-

---

12. Initially, ALJ Beddow, Jr. misrepresents the facts of the Robb survey. She was retained on May 4, 1992 and was fifteen days into her review and verification of the ODH May 1, 1992 citation of the nurses non-professional conduct on May 18, 1992, the date on which they were suspended.

chie's care. The subject patient (whom Ritchie had frequently aided) habitually wore leg braces, could walk only with assistance, usually locomoted by wheelchair, suffered frequent seizures, and typically wore a protective helmet. Ritchie had removed the resident/patient's headgear, braces, and clothing in preparation for the shower. The patient fell, suffering abrasions on his face and other injuries which proximately prompted a trip to a hospital in an ambulance.

The first indication of a mishap was a call for assistance from Ritchie. A replacement nurse who had been recommended by the employment service after the discharge of the LPNs, Aaron Rowe, who responded immediately, found the resident/patient lying on the floor, moaning and obviously injured. Rowe asked Ritchie how the accident had occurred. *RITCHIE HAD REPLIED "I FOUND HIM LIKE THIS."* From Ritchie's statement, Rowe, in his incident report which he prepared immediately subsequent to the accident, stated that Ritchie had left the resident/patient unattended preceding the fall. By contrast, Ritchie, *TWO DAYS LATER*, asserted that he had been holding the victim's hand at the time of the fall but that he did not know if the patient had suffered a seizure or had merely slipped on the wet floor.

Aaron Rowe testified as follows:

Q. Do you remember the incident involving Blane [sic] Ritchie and Donald?

A. Yes.

Q. Would you tell me about that incident?

A. I was doing a med round. And I heard a call for help. So I had to take my med cart in with me cause I couldn't leave it sitting around.

So once I got it in there in a small area, I found him with Donald (last name). He was holding Donald in his arms. And I said, what happened? And he said, *WELL, I FOUND HIM LIKE THIS.*

Q. What did you do with that information?

A. I just found an entry and assessed the situation.

Q. What happened to Donald?

A. They sent him to the hospital by ambulance.

Q. Did he receive any injuries?

A. To his head, yes.

Q. What were the injuries?

A. It was a pretty good cut, skin tear. I can't really recall.

Q. Okay.

\* \* \* \* \* \*

Q. Did you chart that incident?

A. Yes.

Q. Okay.

A. Full and complete.

Q. And how soon after the incident did you prepare the nurses' notes on that incident?

A. As soon as Donald had left and was on his way in the ambulance.

Q. Directing your attention to Respondent 101—

A. Yes.

Q. Next to the entry dated May 22nd, 1992, can you identify that nurses' notes?

A. Yes.

Q. What is it?

A. That's the events that happened.

Q. And whose handwriting is that?

A. Mine.

Q. Okay.

A. Yes.

Q. Now, when you used the term "unattended at time of fall", what did you mean when you wrote that?

A. He was unattended. Blane was assigned to him and had left him standing, which he's a wheelchair patient basically.

Q. Okay.

A. And upon him not being there and left him unattended, he fell.

*J.App.* at 2190–92. (Emphasis added).

Mindful of LPN Rowe's neutral status as an interim employee placed by the employment agency that recommended him immediately subsequent to the termination of nurses Kathy Byers, Lorena Howell, Gale Milhoan, and Carol Redmond, reasonable minds would

attach greater credibility to that summary than to the self-serving declarations of Ritchie made two days after the incident. This is especially so when it is noted that after he (Ritchie) was terminated for cause, but before the unfair labor practice was tried before the ALJ, he (Ritchie) telephoned Rowe and requested him to change his report wherein he attested that Ritchie had left the resident/patient unattended, which resulted in his fall and injury:

> Q. Let me ask you whether you had occasion after Blane took Donald to the hospital to speak with Blane.
>
> \* \* \* \* \* \*
>
> THE WITNESS: I heard what was said in phone conversations. I—he asked me to reconsider the story what happened that night. And he told me he got fired and all that.

*J.App.* at 2192–93.

The incident was also investigated both by OH management and by Case Manager Richard Carrigan of the Columbiana County Board of Mental Retardation and Developmental Disabilities, a neutral state investigator charged with ensuring that OH maintained the caliber of care mandated by state law. As a part of his official duties, Carrigan investigated every incident report filed at OH. *Carrigan testified that he concluded that the patient had fallen because he had been left unattended by Ritchie.* OH Program Director Richard Fithian, who conducted the respondent's incident investigation, also arrived at the same conclusion, which was bolstered by Ritchie's past record of carelessness regarding the safety of clients.[13]

On the record before this court, substantial evidence does not support the ALJ's finding that the reasons proffered by management for Ritchie's dismissal was a mere pretext. OH management was fully justified in discounting Ritchie's self-serving, after-the-fact version of the incident and instead relying upon nurse Rowe's impartial account of the incident and state investigator Carrigan's conclusions that Ritchie's negligence had caused the accident. These conclusions were supported by Ritchie's past job performance. Even in the absence of the union's effort seeking recognition by the respondent, the record discloses good cause for Ritchie's termination. Accordingly, the Board's findings favorable to Ritchie should be vacated and all relief awarded in his favor should be stricken.

OH has also contested the Board's order respecting the June 10, 1992 dismissal of Donna Yeager, a habilitation aid who served as the day shift departmental union representative. As the majority observed, Yeager had a history of exhibiting disrespect for her superiors. The evidence disclosed that she had been suspended in October of 1991 for her negative attitude and interaction with resident/patients as well as staff. She publicly derogated and criticized other staff personnel and the respondent's business operation. It was this October 1991 suspension that prompted her to seek the assistance of the other LPNs to unionize respondent's facility. On May 29, 1992, management suspended Yeager for five days consequent to similar past behavior in the presence of a team of ODH inspectors.[14] On June 10, 1992, only a few days after Yeager had returned to work, state inspectors were again on the OH premises. Habitation Coordinator Kathryn Fristik, who was Yeager's newly employed superintendent and who had not had the opportunity of becoming personally acquainted with her, and state inspector

---

**13.** Ritchie had been disciplined in the past for leaving a hair dryer connected to an electrical outlet in a resident bathroom (an OH policy violation because of the hazard of falling into water which could electrocute someone) and for carelessly driving a company van. He also confronted chronic problems with patient interaction, as evidenced by his suffering more bites from residents than any other OH employee.

**14.** The temporary nurses were conducting a "med pass," a procedure by which prescription drugs are distributed to patients from a cart, prior to loading the patients onto a bus. The nurses in charge of the project had seated some residents on the bus prior to distribution of their medication, and were experiencing some difficulties. Yeager loudly proclaimed that these problems would not occur if the company had retained properly trained nurses. Fithian suspended Yeager for five days for her attempt to incite trouble for OH with the state authorities.

Richard Carrigan entered a room occupied by Yeager and two resident/patients. Yeager was attending a resident/patient who was biting his fingernails. However, another resident/patient present was contemporaneously violently banging his head against a door frame. Yeager ignored this potentially self-injurious behavior. Fristik directed her to attend to him. State inspector Carrigan avowed that Yeager should have prioritized redirection of the potentially injurious behavior on her own initiative without instruction by Fristik. He also commented upon Yeager's insolent manner and her derogatory attitude toward Fristik. .

Immediately following the incident, Fristik admonished Yeager not to assume a negative and hostile tone and attitude with her supervisor, especially in the presence of a state inspector. Yeager walked away and simply ignored her supervisor with a curt insolent retort. Yeager's attitude and insolent manner prompted state inspector Carrigan to inquire of Fristik if she always permitted her subordinates to speak to her in a demeaning fashion. Fristik thereupon suspended Yeager on the spot. Later that day, Yeager's employment was terminated in writing by Manning for insubordination and for not following standard procedures respecting the needs of a resident/patient.

Here again, the ALJ rationalized that Yeager's behavior was an understandable reaction to management hostility toward employees, and that her conduct was not insubordinate. ALJ Decision, page 22; *J.App.* at 40. The ALJ further accused Fristik of seizing upon an "inoculous [sic—innocuous?] situation" to which she "immediately overreacted" to create a pretext to discipline and ultimately dismiss Yeager, *id.,* this in spite of an independent observer's comments to the contrary. This typical speculation simply is not supported by the evidence, as evolved above. The instant circumstances were far from innocuous but instead posed a significant risk to a patient's safety, and Yeager's actions were calculated to discredit OH's management in the eyes of the state case manager. Yeager's conduct rose to the level of incorrigibility and poisoned her working relationship with her new immediate supervisor. Yeager's inexcusable behavior not only justified her dismissal, it *compelled* her discharge. Management would have acted irresponsibly to retain her with knowledge of her continuing hostile attitude, insubordination, and lack of concern for resident/patient welfare.

Accordingly, substantial evidence did not support the findings of the ALJ, which have been adopted by the Board, that the proffered rationale for Yeager's firing was pretextual. Rather, the evidence unequivocally supports the conclusion that Yeager was appropriately terminated for misconduct. Accordingly, the Board's findings in favor of Yeager should be vacated and all relief awarded to her should be invalidated.

In conclusion, the record lacks substantial evidence to support the Board's ruling that the terminations of Kathy Byers, Lorena Howell, Gayle Milhoan, Carol Redmond, Blaine Ritchie, and Donna Yeager constituted unfair labor practices. Rather, the evidence overwhelmingly proved that each of these former employees was discharged by OH management for good cause. The ALJ, whose ruling the Board adopted, ignored probative evidence, and his ruling is contrary to law.[15] The decision of ALJ Beddow, Jr., whose credibility and impartiality are highly questionable in light of the record developed in these proceedings, is anchored upon irrational speculation, insupportable assumptions, and conclusions which contradicted the evidence, and his resolution insults the judicial ethic of impartiality. Accordingly, I **DISSENT** from the majority disposition.

---

15. Another instance of the ALJ's erroneous reasoning is reflected in his resolve on December 29, 1993 that the respondent's July 7, 1992 reduction in Brad Martin's salary from $9.25 to $7.35 per hour, and attendant redesignation of his job title from "Maintenance Supervisor" to "Maintenance Person," infringed the company's purported obligation under 29 U.S.C. § 158(a)(5) to bargain with the union prior to adversely altering Martin's terms and conditions of employment. However, as evolved above, the union had not been recognized by the company until October 12, 1992, and accordingly the company could have had no obligation to bargain with the union regarding any subject prior to that date.