**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PENTRE ELECTRIC, INC., Respondent.**

No. 92–5408.

United States Court of Appeals, Sixth Circuit.

Submitted March 18, 1993.

Decided July 8, 1993.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Collis Suzanne Stocking (briefed), Angela Washington, Office of the Gen. Counsel, Washington, DC, James L. Ferree, N.L.R.B., Cincinnati, OH, for petitioner.

Brett L. Thurman (briefed), Fred A. Ungerman, Jr., Coolidge, Wall, Womsley & Lombard, Dayton, OH, for respondent.

Before: MARTIN and SILER, Circuit Judges, and WELLFORD, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order finding Pentre Electric, Inc. guilty of an unfair labor practice. The Board adopted the conclusion of the administrative law judge that Pentre had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by making statements to its employees about the effect that unionization would have on the company during the representation campaign. Pentre argues that its statements were permissible under section 8(c) of the Act, 29 U.S.C. § 158(c), which allows an employer to express certain views, arguments, or opinions about the prospect of unionization without being guilty of an unfair labor practice. We agree and decline to enforce the Board's order.

Pentre is an electrical contracting company whose primary business is electrical wiring in the commercial building and construction industry. The company, which has been in business since 1984, is co-owned by its president, Phil Luff, and its vice-president and business manager, Pat Meehan. At all times relevant to this action, Pentre had nineteen employees, and the company held regular meetings with its employees to discuss safety and other matters.

In November 1989, the International Brotherhood of Electrical Workers, Local 648, AFL–CIO, began a campaign to organize Pentre's employees. During the campaign before the representation election, Luff briefly expressed his opinion about the prospect of union representation at a safety meeting. In the week before the election, Meehan met individually with about ten of the company's employees to discuss the union.[1] The election was conducted on August 20, 1990. A majority of Pentre employees voted against union representation. The union filed timely objections to the election, alleging that Pentre had engaged in unlawful conduct which affected the outcome of the election. The National Labor Relations

---

1. Meehan also spoke to the employees about the union at a safety meeting on June 13, 1990. The administrative law judge found that this speech did not violate section 8(a)(1), even though that speech and the speeches Meehan made to the individual employees had substantially the same content. The Board also alleged that two supervisory employees, Tim Kennedy and Jim Adams, threatened employees about the consequences of voting in favor of the union. The administrative law judge found no merit to these charges. The Board accepted each of these findings.

Board filed similar charges against Pentre for allegedly engaging in unfair labor practices, and the charges against Pentre were consolidated into one action.

An administrative law judge conducted a hearing on the charges on January 29, 1991. Meehan and Luff both testified, along with several current and former Pentre employees. Luff testified about the nature of the speech he made to Pentre's employees at the safety meeting on July 24. He presented his speech from notes he prepared from an outline he had received from a law firm specializing in labor law. Luff testified that he informed the employees that he "didn't care how they voted, but [he] hoped they voted for [Pentre]." He then made other comments which he described at the hearing:

> I then went into why I felt—why I felt it was in their best interest to vote against the union, vote in favor of Pentre Electric. And I talked about the fact that I did not think we would have a customer base or we would certainly not have the same customer base if we were to go to union.

Luff also said, "... I did talk at length about our customer base and the fact that our customers don't use union contractors." He specifically mentioned three customers for whom Pentre was working at that time. In reference to those customers, he said, "I thought that if we went union, these people would not use us." Luff added, however, "I told them that Pentre would prosper, that I thought we would make it, that we'd been working for six years and we wanted to keep on that way." During cross-examination of Luff, the following dialogue took place between Luff and Eric Taylor, counsel for the National Labor Relations Board:

TAYLOR: Okay. It's true, isn't it, that you told the employees that if they went ahead and voted union that you'd lose your customer base and basically your company wouldn't have any work?

LUFF: I told them that I thought we would not have the same customer base if we went union. And I told them that I—I don't know how we would go about getting another customer base. I'm certain that Pat [Meehan] and I would

probably succeed, we're too young to quit, but—

TAYLOR: Okay. But you also told them, as a result of losing the customer base, you wouldn't have any work for them?

LUFF: I don't think I put it in those words, no.

TAYLOR: Well, what words did you put it in, do you recall?

LUFF: I told them that we would not have the jobs we have now, if we had been union. And I told them that I thought it would be very difficult to get work if we were union. But I did not tell anybody that they were going to lose their job if we went union.

Luff also emphasized that many of Pentre's customers did not employ union contractors, and that there "were ... three jobs [Pentre] had going at the time [of the election campaign] and if we were union contractors we would not have had the three large jobs we were doing with those people."

Meehan testified extensively about the speeches he made to ten individual employees in the week before the election. He testified that at no point did he ask any of the employees if they had signed union cards or how they planned to vote in the election. Meehan then explained that he covered four essential points in each speech. According to Meehan, "The very first thing I started out with is, I tried to explain what the election was for, to make sure that no one misunderstood, again, that they weren't voting to get into the union and that simply by voting to be represented or simply by voting to the affirmative doesn't mean you're going to be a union electrician." Meehan's second point was "to reiterate ... was to explain how we were an open shop business." As part of this point, Meehan explained the nature of the electrical contracting industry, and "about how the work that we're doing, Pentre Electric is doing, is traditionally done by open shop companies.... So, what I was trying to establish with them is that we're not doing union work and we're not competing with union contractors." Meehan justified these statements by referring to specific jobs on which Pentre had been employed and explaining how Pentre had received the con-

tract on those jobs. Meehan also discussed the nature of Pentre's customers by making the following statements:

> ... [W]hat I was doing was establishing that all of our customers—all ... large customers were almost strictly open shop companies, some, of course, did do work with unions. And I said, "That's fine," I said, "That simply means that they're free enterprise and so am I."

> But, for the most part, it was open shop and some of our very good companies were very involved in the open shop industry, so to speak, like, associations and the like.

> So, it would be difficult to maintain those particular customers if we were a union contractor and then if we were a union contractor, we'd have to establish new customers.

Meehan then testified that he told the employees, "I really don't want to go through that again, that's exactly where I was seven years ago, when we started Pentre Electric, was, you know, trying to knock on doors, get cold calls and establish the company and I'm not prepared to do that again." According to his testimony, Meehan then explained the nature of their current contracts with customers and the effect that the union could have on those contracts.

Meehan's third major topic involved laying a "map" establishing the consequences of either electing or not electing the union. Meehan then expressed his opinion about unionization to each of the employees. At the hearing, Meehan explained his closing remarks to the employees: "And my conclusion was ... that I wanted to stress that it was important that everybody vote." Moreover, Meehan testified that he made this statement without asking any employee how he intended to vote and without attempting to coerce the employee into voting a certain way.

Five employees testified that they did not feel that the speeches by Luff and Meehan were threatening, nor did they know of any other Pentre employees who felt threatened or coerced by the message in the speeches.

The administrative law judge found that Pentre, through Luff and Meehan, had violated section 8(a)(1) of the National Labor Relations Act.[2] To support his finding that Luff's speech constituted an unfair labor practice, the administrative law judge characterized Luff's testimony as containing the following statement:

> [W]e would not have the same customer base if we went union. I don't know how we would go about getting another customer base. I'm certain that Pat [Meehan] and I would probably succeed—we're too young to quit, but.... we would not have the jobs we have now if we had been union [and] it would be very difficult to get work if we were union.

The administrative law judge did not consider any of Luff's other testimony. Although he noted the difficult interplay between speech protected by section 8(c)[3] and that made unlawful by section 8(a)(1), the administrative law judge emphasized that Luff had not provided extrinsic evidence to support his statement that Pentre's customers did not use union contractors. Thus, the administrative law judge found that section 8(c) did not protect Luff's statement about the nature of Pentre's customers. The administrative law judge then examined one portion of Meehan's testimony. He focused on Meehan's discussion of the nature of Pentre's customer base and Meehan's statement about the difficulty of establishing a new customer base. The administrative law judge construed Meehan's statement that he was "not prepared" to face the difficulties of rebuilding a customer base as a threat to close Pentre in retaliation for a pro-union vote. Thus, the administrative law judge found that Meehan's statements were

**2.** Section 8(a)(1), 29 U.S.C. § 158(a)(1), provides, "It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

**3.** Section 8(c), 29 U.S.C. § 158(c), provides, "The expressing of any view, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

unlawful because the effect of those statements was to convey to the employees that "[u]nionization ... would result in Pentre closing its doors."

Accordingly, the administrative law judge concluded that the unfair labor practices sufficiently interfered with the employees' freedom to select a bargaining representative, and that a new election was necessary. The Board adopted the findings, rulings, conclusions, and proposed order of the administrative law judge on December 19. On March 19, 1992, the Board applied to this court for enforcement of its order. Pentre argues that this court should decline to enforce the Board's order because the speeches made by Luff and Meehan are protected under section 8(c) of the National Labor Relations Act. We agree.

We sustain the Board's findings of fact only so long as "they are supported by substantial evidence on the record viewed as a whole." *Southern Moldings, Inc. v. NLRB*, 715 F.2d 1069, 1074 (6th Cir.1983) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951)). We also review the Board's application of the law to particular facts under the substantial evidence standard. *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986). To determine whether substantial evidence supports the Board's findings and conclusions, we should consider evidence in the record contrary to those conclusions. *Id.* Substantial evidence, however, is more than a mere scintilla of evidence. *Southern Moldings*, 715 F.2d at 1074 n. 6. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). We review the Board's conclusions of law de novo. *Wilson v. NLRB*, 920 F.2d 1282, 1285 (6th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992). If the Board errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no "reasonable basis in law." *Turnbull Cone Baking Co.*, 778 F.2d at 295 (citing *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)). We believe that the Board's conclusion that section 8(c) does not protect Luff's and Meehan's speeches is not supported by substantial evidence. Furthermore, in our opinion, the Board has erroneously interpreted section 8(c) and *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), as requiring an employer to produce evidence to corroborate predictions about the effect of unionization to invoke the protection of section 8(c).

In enacting section 8(c) of the National Labor Relations Act, "Congress undertook to design the restraints [on employer speech] in a manner that would encourage free debate and more adequately protect the First Amendment rights of employers and unions." *Hecla Mining Co. v. NLRB*, 564 F.2d 309, 313 (9th Cir.1977). "As [we have] stated on numerous occasions, the right of free speech in a union organizational campaign is not to be narrowly restricted." *Boaz Spinning Co. v. NLRB*, 439 F.2d 876, 878 (6th Cir.1971). Thus, Section 8(c) authorizes "the expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, ... if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Such statements shall not constitute or be evidence of an unfair labor practice. *Id.* "Section 8(a)(1), in turn, prohibits interference, restraint, or coercion of employees in the exercise of their right to self-organization." *Gissel Packing*, 395 U.S. at 617, 89 S.Ct. at 1942. Therefore, "[w]hile coercive speech and conduct by an employer are prohibited by the NLRA, the expression of noncoercive views, arguments, and opinions for and against unionization cannot be held unlawful." Rebecca H. White, *The Statutory and Constitutional Limits of Using Protected Speech as Evidence of Unlawful Motive Under the National Labor Relations Act*, 53 Ohio St.L.J. 1 (1992). In other words, if an employer's statements fall within the scope of section 8(c) because they contain no threat of reprisal or promise of benefit, no basis exists for finding that the employer has committed an unfair labor practice. *See Gis-*

*sel Packing Co.*, 395 U.S. at 618, 89 S.Ct. at 1942.

Because "the only effective way of arguing against the union is for the company to point out to the workers the adverse consequences of unionization, ... it is often difficult in practice to distinguish between lawful advocacy and threats of retaliation." *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir.1983). In *Gissel Packing*, 395 U.S. at 616–20, 89 S.Ct. at 1941–43, the Supreme Court examined the scope of section 8(c)'s protection and the interplay of that section with section 8(a)(1) in an attempt to draw the line between lawful and unlawful employer speech more clearly. The court noted that "[a]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Id.* at 618, 89 S.Ct. at 1942. Moreover, the court stated that an employer "may even make a prediction as to the precise effects he believes unionization will have on his company." *Id.*

The court, however, determined that any statement or prediction by an employer about the effects of unionization must meet the following standard to be permissible under section 8(c), *id.* at 618–19, 89 S.Ct. at 1942:

> [T]he prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion.... As stated elsewhere, an employer is free only to tell "what he reasonably believes will be the likely economic consequences of unionization that are outside his control," and not "threats of economic reprisal taken solely on his own volition." (citations omitted).

As we read *Gissel,* if an employer's statement meets this standard, it cannot be a threat of reprisal or force and is therefore protected by section 8(c). "To predict a consequence that will occur because the company wants to punish the workers for voting for the union—a consequence desired and freely chosen by the company rather than compelled by economic forces over which it has no control—is [unlawful]." *Village IX,* 723 F.2d at 1367. On the other hand, an employer may make predictions of consequences that will occur no matter how well disposed the company is toward unions, and such predictions are not unlawful threats of retaliation. *Id.* We believe that the statements made by Luff and Meehan do nothing more than make predictions about the consequences of Pentre's unionization, and that nothing in the record demonstrates that the predicted consequences were driven by Pentre's desire to punish employees for a pro-union vote.

■ We recognize that section 8(c) does not protect statements or predictions regarding the effects of unionization if "their ... reasonable tendency is coercive in effect," *Peabody Coal v. NLRB,* 725 F.2d 357, 363 (6th Cir.1984), and that this determination must be made in the context of the labor relations setting. *Id.* Under section 8(c), however, employees may not reasonably conclude that they are being coerced where the opinions refer to matters over which the speaker has no control. *NLRB v. Okun Bros. Shoe Store, Inc.,* 825 F.2d 102, 107 (6th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). We do not believe that the reasonable tendency of either Luff's or Meehan's statements was coercive in effect. Rather, the statements convey Luff's and Meehan's beliefs as to the probable consequences of Pentre's unionization, and as such, the statements meet the requirements of *Gissel,* 395 U.S. at 618–19, 89 S.Ct. at 1942. The conclusion of the administrative law judge to the contrary is not supported by substantial evidence.

At the safety meeting on July 24, Luff simply told the employees that most of Pentre's customers did not employ union contractors. Based on that objective fact, Luff

predicted that Pentre would likely lose customers and that they would have to build a new customer base in the event of the union's election. Although he expressed his concern about that prospect, nothing in his statements intimated that he or Meehan would close the plant as a result of anti-union animus. Luff's speech conveyed nothing more than his analysis of the likely economic consequences of unionization of Pentre, in light of his knowledge of Pentre's customers and competitors. Not a shred of evidence indicates that Luff predicted these consequences based on matters within his own volition or control. Furthermore, Luff made no threats, nor were his comments interspersed with comments against the union. In fact, Luff even told the employees that Pentre would prosper, that it had been successful for six years, and that he and Meehan wanted to "keep on that way." Therefore, the administrative law judge erroneously concluded that section 8(c) did not protect Luff's statements.

Similarly, the administrative law judge's finding that Meehan's speeches were not protected by section 8(c) is not supported by substantial evidence. Like Luff, Meehan made his predictions about the effect of unionization on Pentre based upon his experience in the electrical contracting industry and his knowledge about the nature of Pentre's customer base. His statement conveyed that the probable consequences of unionization were beyond his control. Although Meehan did state that he was "not prepared" to endure the hardships of rebuilding a customer base, no evidence supports the conclusion of the administrative law judge that this statement constituted a threat of plant closure in retaliation for unionization. The record is simply devoid of any evidence that either Meehan or Luff suggested that Pentre might close its doors, much less that they would close Pentre as a means to punish the employees if they voted in favor of the union. No employee could reasonably have come away from either speech with the belief that anti-union sentiment on the part of the company could lead to closure if the employees voted in favor of the union.

This case is similar to the facts presented in *Patsy Bee, Inc. v. NLRB*, 654 F.2d 515, 518 (8th Cir.1981). In *Patsy Bee*, the court found that an employer's predictions that the company would lose customers as a result of unionization came within section 8(c) as a prediction based upon objective fact. The statements made by Luff and Meehan are substantially like those made by the employer and found lawful by the court in *Patsy Bee*. We believe that Luff's and Meehan's statements meet the *Gissel Packing* criteria in that they merely predict consequences of Pentre's unionization beyond the control of either Luff or Meehan, as did the employer's statements in *Patsy Bee*. The statements contained no threat of reprisal or force, and therefore, the statements are protected by section 8(c).

■ We are also faced with determining whether the administrative law judge and the Board correctly interpreted section 8(c) and *Gissel Packing* as requiring an employer to produce evidence to corroborate its predictions about the effects of unionization to invoke the protection of section 8(c).[4] As the basis for his determination that Pentre's failure to provide proof to support its predictions prevents Pentre from invoking the protection of section 8(c), the administrative law judge relied on decisions of the National Labor Relations Board. *See, e.g., Crown Cork & Seal Co.*, 308 N.L.R.B. No. 68 (1992); *Long Airdox Co.*, 277 N.L.R.B. 1157 (1985); *G.C. Murphy Co.*, 223 N.L.R.B. 604 (1976). These rulings seem to require an employer to present evidence supporting its statements to avoid a finding of an unfair labor practice. We note, however, that several Board decisions run counter to this strict proof requirement. *See, e.g., Benjamin Coal Co. and Empire Coal Co.*, 294 N.L.R.B. 572 (1989); *Storall Mfg. Co.*, 275 N.L.R.B. 220 (1985); *Tri–Cast, Inc.*, 274 N.L.R.B. 377 (1985); *Clintonville Shoe Co.*, 272 N.L.R.B. 609 (1984). These latter decisions state that em-

---

4. The administrative law judge specifically mentioned this issue only with respect to Luff's speech. Both Luff's and Meehan's predictions, however, were based on the fact that Pentre customers used open shop companies. In our opinion, this issue influenced the administrative law judge's finding that Meehan's speeches were unfair labor practices.

ployer argumentation should receive wide latitude where common knowledge and experience combine to substantiate that the employer's remarks or predictions are based on demonstrably probable events, and that detailed, scientific proof that the prediction is true is unnecessary. *See Benjamin Coal Co. and Empire Coal Co.*, 294 N.L.R.B. 572 (1989). Thus, the Board has been inconsistent in its requirement that there be a strict showing of proof to substantiate an employer's statements, even in cases involving bare statements that the plant would close in the event of unionization. *E.g., Tri–Cast, Inc.*, 274 N.L.R.B. 377 (1985).

■ In an unfair labor practices proceeding, the Board bears the burden of proof and persuasion of showing that an employer has engaged in an unfair labor practice. *See Rivers Mfg. Corp. v. NLRB*, 376 F.2d 511, 515 (6th Cir.1967). If the Board does not meet this burden by a preponderance of the evidence, there can be no finding that an unfair labor practice has occurred. *See id.* We believe that the Board's burden of proof encompasses the burden of showing that section 8(c) does not protect an employer's predictions of the consequences of unionization when the employer asserts section 8(c) as a defense. The Board itself has noted that an employer's predictions of adverse economic consequences are to be deemed presumptively truthful. *Benjamin Coal Co. and Empire Coal Co.*, 294 N.L.R.B. 572 (1989). As such, the administrative law judge erroneously placed the burden on Pentre to present collateral proof demonstrating that its statements were protected by section 8(c).

■ Requiring an employer to present, in advance and without a request from the Board, evidence to corroborate its predictions would, in our mind, defeat the integral purpose of section 8(c). On occasion, we have pointed to the absence of factual support for the contested statements in sustaining the Board's finding that the employer violated section 8(a)(1). *See, e.g., Indiana Cal–Pro, Inc. v. NLRB*, 863 F.2d 1292, 1298–99 (6th Cir.1988); *Peabody Coal*, 725 F.2d at 363; *NLRB v. Price's Pic–Pac Supermarkets, Inc.*, 707 F.2d 236, 240 (6th Cir.1983). Nonetheless, we believe that the crucial inquiry for determining whether an employer's statement is a lawful prediction or an unlawful threat is, as the court explained in *Gissel*, the nature of the statement. If the statement itself is objective in nature, then the statement cannot be the basis for an unfair labor practice. *See, e.g., Boaz Spinning Co.*, 439 F.2d at 878–79 (finding an employer's predictions about the effect of unionization objectively phrased in that the statements referred to events at other similar companies); *Village IX*, 723 F.2d at 1364, 1368 (finding that employer's statement that his company would fail if it became unionized was objective because the employer discussed the competitive nature of his business and the effect of the union at a competitor). On the other hand, if the statement is subjectively phrased in that it conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus, the statement is an unlawful threat. *See, e.g., Indiana Cal–Pro, Inc.*, 863 F.2d at 1298–99 (finding that employer's statement that the plant would close in the event of unionization was purely subjective and therefore, not protected by section 8(c)). Luff and Meehan explained that Pentre's customers hired non-union contractors, an objective statement, as the basis for the prediction that unionization could lead to losing some of Pentre's customers, and neither Luff nor Meehan indicated that Pentre would close its doors in retaliation for a pro-union vote by the employees.

Of course, the basis for an employer's statements must be truthful for the statement to receive the protection of section 8(c). *Boaz Spinning Co.*, 439 F.2d at 879. The Board, however, bears the burden of demonstrating that an employer's statement is unlawful, either because it is not objective in nature or because it is untruthful. In this case, nothing in the record indicates that either Luff or Meehan made untrue statements in connection with their predictions of the effect of unionization on Pentre. Moreover, the statements are objectively phrased, and they do not refer to matters over which Luff or Meehan had control.

The Board's application for enforcement of its order is denied.