**CONTECH DIVISION, SPX CORPORATION, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Intervenor.**

Nos. 97–5099, 97–5247.

United States Court of Appeals, Sixth Circuit.

Argued March 13, 1998.

Decided Dec. 30, 1998.

Peter J. Kok (argued and briefed), James R. Peterson, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, David M. Buday (briefed), Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for Petitioner/Cross–Respondent.

Aileen A. Armstrong, (briefed), Deputy Assoc. Gen. Counsel, Peter Winkler (argued and briefed), Deborah E. Shrager (briefed), National Labor Relations Board, Washington, DC, for Respondent/Cross–Petitioner.

Jordan Rossen (briefed), Nancy Schiffer (argued and briefed), Associate General Counsel, Detroit, MI, for Intervenor.

Before: RYAN, COLE, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

This matter arises from the efforts of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("the UAW") to organize the production and maintenance employees ("the employees") of Contech Division, SPX Corporation in Dowagiac, Michigan. After setting aside the results of a certification election in which a majority of the employees voted against UAW representation, the National Labor Relations Board ("the Board") ordered a new election in which the UAW prevailed. The Board subsequently certified the results of the latter election and designated the UAW as the exclusive collective-bargaining representative of the employees.

Upon Contech's refusal to bargain with the UAW, the Board charged Contech with a violation of Sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) and (5), and issued an order directing that Contech bargain on request with the UAW. Contech now petitions for review of that order, and the Board brings a cross-application to enforce the same. Contech asserts that the Board improperly set aside the results of the first election and also improperly certified the results of the second election. We are satisfied, however, that substantial evidence supports each of the Board's decisions in question. Accordingly, we **DENY** Contech's

petition for review and **GRANT** the Board's cross-application for enforcement of its order.

## I. BACKGROUND

Contech, a parts manufacturer for TRW, Ford Motor Company, and other automotive suppliers, operates two plants in Dowagiac, Michigan ("Plant 1" and "Plant 3") and a plant in Auburn, Indiana. SPX Corporation, Contech's parent company, operates a plant in Muskegon, Michigan.

In November of 1994, the UAW filed a petition for a Certification of Representative ("the representation petition") with the Board, indicating that "a substantial number of [the] employees wish to be represented for purposes of collective bargaining by [the UAW] and [the UAW] desires to be certified as representative of the employees." Pursuant to a Stipulated Election Agreement, a certification election was scheduled for January 12, 1995. During the pre-election campaign, Contech engaged in conduct that prompted the Board to set aside the results of the election. The specific nature and effect of that conduct, as found by the Board, is set forth in detail below.

### A. The First Election

On November 17, 1994, three days after the UAW filed the representation petition, the employees received a letter from Dwayne Weber, Contech's Human Resources Manager. Weber stated in the letter that over two-thirds of the 600 plants that had closed in Michigan over the past two decades had union work forces.

The employees also received a handout containing a reprinted newspaper article addressing Ford's removal of manufacturing dies from an Indiana plant where employees were on strike. The following statements from the article were emphasized in the margins of the reprinted pages: "DIES OWNED BY FORD MOTOR COMPANY," and "THE DIES WOULD HAVE STAYED AT THE PLANT ANOTHER FOUR YEARS IF THE STRIKE HAD NOT OCCURRED." The handout noted that the UAW was the union involved in the article.

Another Contech handout contained a reprint of a 1982 letter in which a Contech customer informed Contech's general manager that it had "closed its doors ... due to union difficulties." On the back page of both of the above handouts, the following message appeared in large print: "SAY NO TO THE POSSIBILITY OF LOST CUSTOMERS, LOST JOBS, LOST PAY, LOST BENEFITS, AND OTHER TROUBLES—VOTE NO."

In late December, Contech transferred the production of the MN–12, a Ford part, from Plant 3 in Dowagiac, Michigan to the plant in Auburn, Indiana. Contech did not provide any explanation to the employees for making this transfer.

Several days after the UAW filed the representation petition, Robert Davis, Contech's Director of Sales and Marketing, met with Gary Mahon, TRW's Director of Purchasing. The purpose of the meeting was to negotiate a renewal of their contract for the manufacture of TRW's rack-and-pinion steering housings, the production of which constituted about 15% of the output of Plant 1 and 90% of Plant 3. At the meeting, Mahon informed Davis of TRW's desire to postpone contract-renewal negotiations "until [Contech's] union representation issue as well as some long-standing quality and delivery issues between [Contech] and TRW were resolved."

In a December speech, Contech's Director of Manufacturing Joe Barry indicated to the employees that TRW would not renew its contract with Contech until after the election. In a separate speech, Brad Farver, Contech's Manufacturing Manager, referred to a letter from TRW to Contech in which TRW purportedly communicated a concern about Contech becoming unionized. Farver, however, declined to elaborate when asked by the employees to explain why TRW would not want to deal with Contech in the event that Contech became unionized. Moreover, Contech did not explain to the employees that product quality and delivery issues were contributing factors in TRW's hesitancy at entering into a long-term renewal contract.

Also in December, Contech showed its employees a video depicting strike violence. At that meeting, Barry and Farver discussed

with them the status of the TRW contract-renewal negotiations. Barry stated that "negotiations had been suspended 'until we got some of our problems behind us.'" Farver stated that "TRW had postponed long-term agreements 'until our issues are resolved.'"

During the two weeks preceding the election, Contech displayed large poster photographs of closed manufacturing plants. These posters remained on display until immediately before the election. On January 10, 1995, two days before the election, Contech distributed a handout signed by Weber explaining that the closed plants pictured in the posters "were in Michigan and were now closed, that all of the employees who had worked in those plants were now laid off, many permanently, and that in each instance the laid off employees had been represented by a union." The handout also provided that since 1987, there had been a reduction of almost 400 UAW jobs at SPX's Muskegon, Michigan plant. Moreover, the handout stated that within that past year, 105 union jobs were lost when SPX closed its Ravenna, Michigan plant because of "ineffective operation." Weber's note concluded: "A UNION DOES NOT PROVIDE JOB SECURITY." In the interim, Mark Hunsberger, a Contech Supervisor, stated to "at least three or four employees individually" that TRW had sent one of its dies to another company to determine whether that company could produce the part.

On January 9, 1995, three days before the first election, Al Zagotta, Contech's President, sent a letter to the employees. In the letter, Zagotta explained that Contech was in a "very critical stage in its relationship with certain key customers like TRW, Ford, and Saginaw." Zagotta's letter continued as follows:

I am concerned that if the Dowagiac plant develops a reputation for not being a dependable supplier—because of labor problems, a UAW-led strike, or even the possibility of a strike every time the contract comes up for renewal—our customers may become nervous and look elsewhere for another source for their parts.

On January 10, 1995, two days before the election, Gary Walker, a Division Manager of Contech, spoke to the employees. He stated that Contech was "greatly concerned about the impact the union could eventually have on our customers like TRW and our ability to compete." He also referred to what he termed as the "horrendous strike record of the UAW," "the [hundreds] of closed plants in Michigan and the hundreds of thousands [of] UAW members who lost their jobs ... as a result of inefficient operation and UAW-led strikes." Furthermore, Walker shared his observation that "the UAW is always at the heart of conflict." He also discussed three unionized SPX plants in Western Michigan that "were either partially or totally shut down because they were allegedly no longer competitive."

During January 9 and 10, the same two-day period that Zagotta and Walker made the above statements to the employees, Jack Fannon, TRW's Quality Representative, made a thorough inspection tour of Contech's two Dowagiac facilities, accompanied by an entourage of Contech managers and supervisors—all of which was highly visible to the employees.

Finally, Contech's supervisors at both Plant 1 and Plant 3, on all three shifts, regularly discarded UAW literature left in the respective lunchrooms of the plants. Those supervisors, however, did not disturb current newspapers, magazines, and Avon booklets.

An election by secret ballot was conducted on January 12, 1995 ("the first election"). The results of the first election were as follows: 154 votes in favor of UAW representation, 196 votes against UAW representation, and four challenged ballots, a number insufficient to affect the results.

The UAW subsequently filed six objections to the first election. Specifically, the UAW alleged that Contech and its agents: (1) conducted a "campaign of fear and intimidation through predictions of violence, strikes, loss of customers and economic detriment which they insinuated would inevitably result from a union victory," (2) made "pro-company campaign insignia available to employees, thereby forcing the employees to make known their pre-election preferences," (3)

threatened to "go out of business, close the plant or that customers would remove work if [the UAW] won the election," (4) created "the impression of futility by stating that [Contech] would not bargain in good faith if [the UAW] won the election," (5) confiscated "union literature," and (6) conducted the election "in an area used by [Contech] to propagandize employees."

A Hearing Officer of the Board thereafter conducted a hearing on UAW's six objections. In April of 1995, the Hearing Officer issued a report recommending that the Board sustain the part of Objection 1 concerning Contech's predictions of customer loss as an inevitable result of union victory, and all of Objections 3 and 5. Contech subsequently filed exceptions to the Hearing Officer's report.

In December of 1995, the Board adopted the Hearing Officer's recommendations in a Decision and Direction of Second Election, concluding that "parts of [Contech's] speeches, statements, and other communications had a reasonable tendency to create and reinforce an atmosphere of fear among the employees that a union victory could result in loss of work, jobs, and customers, and in-plant closure." The Board further found "no objective factual evidence to support [Contech's] implication to [the] employees that [its] customers 'become nervous' as a result of the mere presence of a union."

In support of its conclusions, the Board found that: (1) although Contech normally would have informed the employees as to why production of a part was leaving Plant 3, it issued no explanatory communication upon the removal of the Ford MN–12 production from the plant. In the absence of such an explanation, the reprinted newspaper article concerning Ford's removal of dies from the Indiana plant "took on added significance for the employees," and would tend to suggest that the removal of MN–12 production was related to the UAW's presence, (2) Hunsberger's statement that TRW had sent one of its dies to another company "would have been widely disseminated throughout the unit," (3) the comments of Barry and Farver concerning the postponement of negotiations with TRW, along with Hunsberger's statement

that TRW had sent one of its dies to another company, "would reasonably lead the employees to conclude that TRW's relationship with [Contech] was in jeopardy because of [the UAW], and that the outcome of the first election could determine whether the TRW contract was renewed," (4) "in the context of the statements of Barry, Farver, and Hunsberger, which gave the employees reason to believe that TRW and Ford were already retreating from their relationship with [Contech] because of [the UAW], Walker's statements in his January 10 speech had a reasonable tendency to make the employees fearful that a union victory could result in loss of work for [Contech]," (5) the impression conveyed to the employees by the comments of Barry, Farver, and Hunsberger was further amplified by Fannon's highly visible quality-inspection tour (just several days before the election), which in turn (a) gave additional weight to Zagotta's concern that Contech's customers would become nervous about the UAW's presence, and (b) provided additional context for Walker's concern that Contech's relationship with TRW "would be affected by the outcome of the election," and (6) the end-of-campaign statements of Zagotta and Walker "would reasonably have been understood by [the employees] as an implicit prediction that work and jobs would be lost if [the UAW] won the election."

Finding that these circumstances reasonably tended to create an impression that a UAW victory would result in harm to the employees, the Board set aside the results of the first election and directed that a second election be conducted.

## B. The Second Election

Prior to the second election, the employees received a series of open letters from the UAW. Contech subsequently argued that these letters misled the employees and thus warranted setting aside the results of the second election.

In one such letter ("the UAW letter"), the UAW described Contech's actions and the Board's findings regarding the first election as follows:

The National Labor Relations Board (NLRB) has found that your employer en-

gaged in objectionable conduct during your union representation election last year when management blatantly misled you about customer concerns and loss of jobs. The NLRB report makes it clear that the company set out from the start of their anti-union campaign last year until right up to the election to deliberately misconstrue events and customer actions. It's also clear that they fully intended and planned to threaten, intimidate and coerce employees by their actions. Top management officials were involved in these unsavory illegal objections against you.

\* \* \*

Your employer *should* allow you to vote this time without being subjected to company intimidation, coercion and threats. Out of desperation management may use tactics similar to those they used last time but they will probably attempt to be more devious in an attempt to cover up. If you see tactics that you feel may be threatening, intimidating and thus illegal, feel free to call the UAW for assistance and protection.

Lee Hodge, President of UAW Local 1218, then sent the employees the following letter ("the Hodge letter"):

My wife has worked at Contech for over 20 years. With that thought in mind, I want to reassure each and every one of you that I have never, nor will I ever, lie or try to deceive you concerning the upcoming vote for the UAW. But, I cannot say the same for your Contech management. They have spread false rumors of your plant moving, and of losing Ford and TRW work. They have threatened and coerced Contech workers during your last election for the UAW, and their misrepresentation of the facts were [sic] proven by the National Labor Relations Board (NLRB). The reason you are allowed to vote again at this time is because the NLRB felt that Contech workers deserved another vote because of company lies and distortions during your last election.

\* \* \*

The National Labor Relations Board has found Contech guilty of giving you untrue information regarding customer intentions. We have a copy of this NLRB document at our office, and it can be read by anyone who wishes.

Phil Dubensky of Ford Motor Company also sent the following letter to the UAW ("the Ford letter"), dated and distributed one day before the second election, addressing the suggestion that Ford would withdraw its business if the UAW prevailed:

This is pursuant to your inquiry of March 8, 1996 regarding SPX–Contech and the assertion that its Plant Manager in the past has advised employees that if the current UAW organizing effort is successful, Ford will "pull" its business.

Ford's longstanding policy is *not* to become involved, in any way, with UAW organizing efforts that may be initiated within the supplier community. Furthermore, the Company's decision to source product to a particular supplier, or remove product from a current supplier, is based on numerous criteria. Removal of a product, simply because employees of a supplier elect to join the UAW, is definitely *not* Ford Motor Company's policy. Representations to the contrary would be without foundation.

Finally, UAW's in-house organizing committee issued a letter ("the committee letter"), which was posted on Contech's bulletin board. It read as follows:

The management HAS the kind of benefits that we would like to have. Their pension plan is also much better than ours.... [The] management can't see why we need a Union. Have you noticed that the supervisors are Not trying to Talk us out of voting YES this time? They are the ones that used to be in the position we are in. They can relate to our fears of having little or nothing after many years of dedicated service.

A second election by secret ballot was conducted on March 13, 1996 ("the second election"). The results of the second election were as follows: 184 votes in favor of UAW

representation, 150 votes against UAW representation, and 16 challenged ballots, a number insufficient to affect the results.

Contech subsequently filed four objections to the second election, each of which pertained to the foregoing letters. Specifically, Contech alleged that the UAW, its employees, agents, and others acting on its behalf: (1) falsely informed the employees within one day of the second election that Contech "had made misrepresentations to them that one of its customers would 'pull its business'" (2) implied that unless the UAW "were chosen as the bargaining representative, a significant customer would remove its business from the plant," (3) misrepresented to the employees "the nature of the findings in the previous objection proceeding," and (4) informed the employees that "front line supervisors favored the UAW, and thereby implied that retaliatory action would be taken against them if they did not vote in favor of [the UAW]."

In April of 1996, the Regional Director of the Board ("the RD"), without conducting a hearing, issued a report recommending that Contech's objections be overruled in their entirety and that a Certification of Representative issue. In disposing of the first three of Contech's objections, which arise from purported misrepresentations contained in the UAW letter, the Hodge letter, and the Ford letter, the RD relied primarily upon *Midland Nat'l Life Ins. Co.*, 263 N.L.R.B. 127, 1982 WL 23832 (1982). In *Midland*, the Board held as follows:

> [W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.... [W]e will continue to protect against other campaign conduct, such as threats, prom-

ises, or the like, which interferes with employee free choice.

*Id.* at 133 (footnotes omitted). The RD found that under *Midland*, the letters in question were not sufficiently deceptive to warrant Board action.

As to the fourth of Contech's objections, which was based upon the committee letter, the RD concluded that Contech "has failed to establish that, in fact, its supervisors engaged in pro-union conduct." It further stated that the letter would not reasonably cause employees to "be misled into believing that [Contech] favored unionization."

Contech subsequently filed exceptions to the RD's report. Upon review of the RD's report and Contech's exceptions thereto, the Board adopted the RD's findings and recommendations, and issued the UAW a Certification of Representative accordingly. In analyzing Contech's exception to the RD's reliance upon *Midland*, the Board looked to *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343 (6th Cir.1984), in which this court held that misrepresentations may serve as the basis to set aside an election if they are "so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." *Id.* at 348. The Board then determined that the present matter "is not a case of pervasive misrepresentation or artful deception." At most, the Board found, the UAW "has mischaracterized the precise rationale for the Board's decision to set aside the results of the election."

## C. The Board's Order

Notwithstanding the Board's issuance of a Certification of Representative to the UAW, Contech refused to comply with the UAW's requests to meet for the purpose of negotiating a collective-bargaining agreement. The UAW responded by filing an unfair labor practice charge against Contech in October of 1996.

The General Counsel of the Board followed up by filing a complaint against Contech, alleging that Contech's refusal to bargain with the UAW constituted a violation of Sec-

tions 8(a)(1) and (5) of the Act. In its answer, Contech acknowledged its refusal to bargain with the UAW, but attacked the validity of the Board's certification of the UAW as the exclusive collective-bargaining representative of the employees. In November of 1996, the General Counsel filed a motion for summary judgment. The Board ultimately granted that motion in a Decision and Order entered on December 9, 1996. The Board's order directs that Contech, among other things, cease and desist from refusing to bargain with the UAW.

### D. The Present Applications

Contech subsequently filed the present petition for review of the Board's order. In response, the Board filed a cross-application for enforcement of the order. In March of 1997, this court granted UAW's motion to intervene in the present matter.

In support of its petition, Contech asserts that the Board improperly: (1) set aside the results of the first election and ordered a second election, (2) overruled Contech's objections to the second election, and (3) issued the UAW a Certification of Representative with respect to the employees. Moreover, Contech asserts that the Board should have conducted a hearing with regard to its objections to the second election. Contech, however, made no request for such a hearing when filing those objections. Furthermore, Contech did not raise this contention before the Board. In light of Contech's failure to demonstrate the existence of extraordinary circumstances that would excuse it from not raising the lack of a hearing before the Board, we shall not consider this contention on appeal. *See* 29 U.S.C. 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

### II. ANALYSIS

#### A. Standard of Review

■ We begin by noting that "Congress has vested the Board with considerable dis-cretion in supervising and regulating representation elections." *NLRB v. Tennessee Packers, Inc.*, 379 F.2d 172, 180 (6th Cir. 1967). In an effort "to assure employees the greatest freedom of choice in the selection of their representatives," the Board strives to conduct representation elections "in an atmosphere in which employees are free from pressure, coercion and undue influence from either the employer or the union." *Id.* When a party's pre-election conduct unduly influences the result of an election, "the Board has set aside such election and ordered a new one." *Id.*

■ A party seeking to overturn the results of a representation election bears "the burden of showing that the election was not conducted fairly." *NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1180 (6th Cir. 1988). In order to satisfy its burden, the objecting party must demonstrate that "unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election." *NLRB v. Shrader's, Inc.*, 928 F.2d 194, 196 (6th Cir.1991). On the other hand, for the Board to set aside the results of an election, "[i]t is not necessary that conduct which interferes with the freedom of choice in an election actually constitute an unfair labor practice." *Tennessee Packers*, 379 F.2d at 181.

■ Because we afford the Board "broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union," *NLRB v. Duriron Co.*, 978 F.2d 254, 256–57 (6th Cir.1992), "[t]he Board's findings with respect to whether an election reflected the 'free and fair choice' of the employees 'will not be disturbed on appeal where there is substantial evidence ... to support its conclusions." *NLRB v. Dickinson Press Inc.*, 153 F.3d 282, 285 (6th Cir.1998) (quoting *Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1155 (6th Cir.1996)). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Accordingly, we may not displace the Board's reasonable inferences "even though [we] might justifiably have reached a different conclusion had the matter been before [us] *de novo.*" *Tony Scott Trucking, Inc. v. NLRB,* 821 F.2d 312, 313 (6th Cir.1987).

## B. The First Election

■ We are satisfied that substantial evidence supports the Board's determination that the circumstances surrounding the first election did not allow the employees to exercise a free and fair choice in deciding whether to be represented by the UAW. The Board's determination was not based on any single incident, but on the totality of the pertinent circumstances discussed in Part I.A. above. The Board concluded that these circumstances "had a reasonable tendency to create and reinforce an atmosphere of fear among the employees that a union victory could result in loss of work, jobs, and customers, and in-plant closure" (citing *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618–19, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)), and ordered a second election accordingly. In light of the broad discretion afforded the Board "to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union," *Duriron,* 978 F.2d at 256–57, a reversal of its decision to set aside the results of the first election is unwarranted.

■ But Contech argues that the record before the Board was devoid of any evidence that Contech's employees were actually intimidated or misled by its conduct. Such proof, however, is unnecessary. *See Dickinson,* 153 F.3d at 286 ("The subjective reactions of employees, like the subjective intent of the alleged wrongdoer, are not dispositive.... Rather, whether the alleged misconduct was reasonably likely to interfere with employees' free choice depends on objective facts, such as the timing of the allegedly improper act, the capacity of the actor, and similar prior acts.") (internal citation omitted).

■ Relying primarily upon *NLRB v. Pentre Electric, Inc.,* 998 F.2d 363 (6th Cir. 1993), Contech also asserts that the Board improperly set aside the results of the first election because the statements of Contech's representatives were truthful and entitled to protection under Section 8(c) of the Act, 29 U.S.C. § 158(c), which provides as follows:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, *shall not constitute or be evidence of an unfair labor practice* under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

(emphasis added).

Contech posits in its brief that "if the Board's decision is affirmed, employers' free speech will be chilled and they will be restricted from making objective *truthful* statements, if those truthful events can somehow be viewed by the Board or some other third party as somehow scaring employees." In light of the record before us, however, we find Contech's concerns to be unfounded, and conclude that its reliance upon Section 8(c) and *Pentre* to be misplaced.

In *Pentre,* the Board petitioned for enforcement of an order finding that Pentre Electric, Inc. violated Section 8(a)(1) by "making statements to its employees about the effect that unionization would have on the company during the representation campaign." 998 F.2d at 365. In declining to enforce the order, this court held that the employer's statements were permissible under Section 8(c), stating that "if an employer's statements fall within the scope of [S]ection 8(c) because they contain no threat of reprisal or promise of benefit, no basis exists for finding that the employer has committed an *unfair labor practice.*" *Id.* at 368 (emphasis added). Furthermore, *Pentre* held that the Board's burden of demonstrating that an employer has engaged in an unfair labor practice encompasses the burden of demonstrating that "[S]ection 8(c) does not protect an employer's predictions of the consequences of unionization when the employer asserts [S]ection 8(c) as a defense." *Id.* at 371. Accordingly, the court held that the Board erroneously determined that an employer must "produce evidence to corrobo-

rate predictions about the effect of unionization to invoke the protection of [S]ection 8(c)." *Id.* at 368.

Unlike *Pentre*, which involved an alleged unfair labor practice arising from an employer's pre-election conduct, the present matter involves the Board's broader discretion to set aside the results of an election. Although the Board ultimately found Contech to be in violation of Sections 8(a)(1) and (5), those charges arose from Contech's refusal to bargain with the UAW after the second election, not from its conduct during the first election. Because Section 8(c) only applies to unfair labor practice charges, Contech's assertion that it effectively precludes the Board from setting aside the first election is without merit. The Board may set aside an election even though an employer's conduct does not rise to the level of an unfair labor practice. *See Tennessee Packers, supra,* 379 F.2d at 181.

■ Furthermore, even if we were to apply Section 8(c)'s language to the election context, we note that the employer's expression of its views is protected only "if such expression contains no threat of reprisal. . . ." Where Contech crossed the line in the present case is not its use of the handouts, posters, and newspaper articles showing job losses elsewhere that Contech attributed to union representation, but in the linking of such literature to its own intimidating conduct in transferring production of the Ford part to another Contech plant without explanation, in its timing of the quality-inspection tour by TRW officials, in its selective removal of union literature from the plant lunchrooms, and in the misleading content of certain pre-election statements made by its own officials. The Board in effect concluded that Contech's overall conduct contained the threat of reprisal, thus denying the employees a free and fair election choice. Although this is admittedly a close case, where reasonable minds could reach opposite conclusions on the facts presented, we cannot say that there is an absence of substantial evidence to support the Board's findings. Given the deference to which the Board is entitled within its area of expertise, we therefore decline to disturb the Board's action in setting aside the first election.

## C. The Second Election

■ We are also satisfied that substantial evidence supports the Board's determination that the circumstances surrounding the second election allowed the employees to exercise a free and fair choice in deciding to be represented by the UAW. After the second election, Contech filed four objections regarding alleged misrepresentations contained in the letters that the UAW had disseminated to Contech's employees. *See* Part I.B. We agree with the Board's rationale for rejecting each of Contech's objections. *See id.* The Board correctly found that the alleged UAW misrepresentations were not so egregious as to justify setting aside the second election. The governing standard is set forth in *Van Dorn Plastic Machinery, Co. v. NLRB,* 736 F.2d 343 (6th Cir.1984), in which this court stated as follows:

> There may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected. We agree with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made.

*Id.* at 348 (citing *Midland,* 263 N.L.R.B. at 131).

UAW's letters do not include the type of pervasive misrepresentation or artful deception that *Van Dorn* posited would inhibit employees' rights to free and fair choice. Although several of the UAW letters distributed to Contech's employees contained arguably misleading statements, we are satisfied that the Board properly concluded that the employees' right to a free and fair choice was not affected by their dissemination.

To the extent that the UAW letters might be regarded as "propaganda," such is common in almost all representation elections. The employees were free to evaluate the letters as such, and Contech was free to respond in kind. If absolute objectiveness

and pristine conduct were required in order to sustain an election, then virtually none would survive the rough and tumble of labor-management contentiousness. *See Dickinson,* 153 F.3d at 284 ("Although the Board strives to maintain 'laboratory conditions' during representation elections, such conditions are rare, 'and elections are not automatically voided whenever they fall short of perfection.'") (quoting *Duriron,* 978 F.2d at 256). Instead, it is sufficient that the misrepresentations not be "so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." *Van Dorn,* 736 F.2d at 348. Accordingly, we reject Contech's contention that the UAW conducted a campaign of deliberate and pervasive misrepresentations that unlawfully influenced Contech's employees.

## III. CONCLUSION

Because substantial evidence supports the Board's decisions to set aside the results of the first election and to certify the results of the second election, we **DENY** Contech's petition for review and **GRANT** the Board's cross-application for enforcement of its order.